PEOPLE v CHANDLER

Docket Nos. 144968, 151287. Submitted April 5, 1995, at Lansing.
Decided June 23, 1995, at 9:25 A.M. Leave to appeal sought.

Gregory Chandler was convicted by a jury in the Washtenaw
Circuit Court, William F. Ager, Jr., J., of assault with intent to
commit criminal sexual conduct and pleaded guilty of being a
fourth-offense habitual offender. The defendant was sentenced
as an habitual offender to twenty-five to sixty years' imprison-
ment. In a separate proceeding before the same judge, another
jury convicted the defendant of first-degree criminal sexual
conduct involving another victim, and the defendant pleaded
guilty of being a fourth-offense habitual offender. The defen-
dant was sentenced as an habitual offender to twenty-five to
sixty years' imprisonment, to be served concurrently with the
prior sentence. The defendant appealed in each case, and the
appeals were consolidated.

The Court of Appeals *held:*

1. The trial court did not err in admitting the results of
deoxyribonucleic acid (DNA) identification tests performed on
the defendant's blood and on semen found on the victims'
clothing and one of the victim's bedsheets. The restriction
fragment length polymorphism (RFLP) method of DNA testing
and the product rule method of statistical analysis for DNA
matches, both of which were used in these cases to identify the
defendant as the perpetrator of the sexual offenses, are gener-
ally accepted in the scientific community. Michigan courts may
take judicial notice of the reliability of these methods. The
results of tests that employ these methods are admissible in a
criminal trial as long as the prosecution shows that generally
accepted laboratory procedures were followed.

2. The trial court did not err in denying the defendant's
motion for the suppression of evidence seized pursuant to a
warrant. The record does not support the defendant's claim
that the police detective who submitted the affidavit in support
of the application for the search warrant knowingly, intention-

REFERENCES

Am Jur 2d, Evidence § 574.
Admissibility of DNA identification evidence. 84 ALR4th 313.

ally, or recklessly failed to include crucial information. Consideration of the information claimed to have been omitted does not affect the finding of probable cause to believe that evidence of criminal conduct was at the place that was searched.

3. With regard to the sentence for the assault conviction, the trial court did not err in stating that the sentencing guidelines do not apply to habitual offenders. Furthermore, the sentence does not violate the principle of proportionality and is not unconstitutional punishment based on the defendant's status as an habitual criminal in the first-degree criminal sexual conduct case.

Affirmed.

CRIMINAL LAW — EVIDENCE — DNA IDENTIFICATION.

The restriction fragment length polymorphism method of deoxyribonucleic acid testing and the product rule method of statistical analysis for DNA matches are generally accepted in the scientific community; Michigan courts may take judicial notice of the reliability of these methods and admit into evidence the results of tests employing these methods where the prosecution shows that generally accepted laboratory procedures have been followed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Brian L. Mackie,* Prosecuting Attorney, and *David A. King,* Senior Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Richard B. Ginsberg*), for the defendant on appeal.

Before: CORRIGAN, P.J. and MARKEY and J. R. ERNST,* JJ.

CORRIGAN, P.J. In these consolidated cases, defendant Gregory Chandler appeals as of right in Docket No. 144968 his conviction by jury of first-degree criminal sexual conduct, MCL 750.520b(1) (e); MSA 28.788(2)(1)(e), and plea-based conviction of being an habitual offender, fourth offense, MCL 769.12; MSA 28.1084, and in Docket No. 151287

* Circuit judge, sitting on the Court of Appeals by assignment.

his conviction by another jury of assault with intent to commit criminal sexual conduct, MCL 750.520g(1); MSA 28.788(7)(1), and plea-based conviction of being an habitual offender, fourth offense. Defendant was sentenced as an habitual offender to concurrent prison terms of twenty-five to sixty years. We affirm.

## I. UNDERLYING FACTS

These cases arise from sexual assaults on two victims in November 1989 and April 1990.

### A. DOCKET NO. 151287

On November 9, 1989, at 3:00 A.M., defendant broke into the first victim's apartment on Catherine Street in Ann Arbor. Defendant threatened to kill the victim unless she cooperated with him. He attempted to penetrate her vaginally and orally, but abandoned those efforts when the victim told him that she had a sexually transmitted disease. Instead, defendant masturbated and ejaculated on the victim's chest, wiped up his semen with her underpants and made his escape. Ann Arbor police were subsequently called to the scene. They recovered the victim's underpants a few blocks away. The police took the victim's bedsheets, underpants, and bathrobe and samples of her hair, saliva, and blood for DNA testing.

### B. DOCKET NO. 144968

On April 28, 1990, defendant broke and entered the second victim's apartment on State Street in Ann Arbor. Defendant held the victim at knife point and orally penetrated her until he ejaculated into her mouth. The victim spit the defendant's semen onto her pajamas. Defendant took the vic-

tim's pajamas and a blanket from her bed and fled. Once again, police were called to the scene. Investigators found a skirt on the floor of the victim's room that also contained semen. Police took the skirt and samples of the victim's hair, saliva, and blood for testing.

## II. PROCEDURAL HISTORY

During their ongoing investigation, officers observed defendant many times in the neighborhood where the sexual assaults had occurred. On the basis of their surveillance and the first victim's rough description of defendant, Detective Joseph Wesolowski obtained a search warrant to retrieve samples of defendant's hair, saliva, and blood for DNA testing and comparison in both cases. Defendant moved to suppress the results of those tests in both cases. The court denied defendant's motions and admitted the evidence.

Defendant also moved to suppress the results of the DNA testing in both cases. The trial court held a *Davis/Frye*[1] hearing in Docket No. 151287, determined that the evidence was generally accepted in the scientific community, and admitted the testimony in both cases. The court declined to hold a second *Davis/Frye* hearing in Docket No. 144968, in light of the three-day hearing in Docket No. 151287 during which the identical evidence had been presented.

## III. ADMISSIBILITY OF DNA MATCHING AND STATISTICAL EVIDENCE

Defendant first contends that the trial court erred in admitting into evidence DNA identification

---

[1] *Frye v United States,* 54 App DC 46; 293 F 1013 (1923), and *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955).

test results and the statistical analysis of those results in both cases. We disagree.

Samples of defendant's blood and crime scene samples of semen left on the victim's bathrobe, underpants, and bedsheets in Docket No. 151287 and the victim's skirt in Docket No. 144968 were subjected to DNA restriction fragment length polymorphism (RFLP) testing at Cellmark Diagnostics and the FBI laboratories. The RFLP method of DNA testing consists of a variety of technical steps that fall into three basic groups—processing, matching, and statistical analysis.[2] After processing the samples of DNA extracted from defendant's blood and the samples extracted from the various articles of clothing, both Cellmark and the FBI declared a "match." A match occurs when four or more particular "bands" are found in the samples taken from the crime scene and the suspect.

The matching samples or "banding patterns" were then subjected to statistical analysis to determine the significance of the match. DNA statistical analysis determines the frequency with which a particular match occurs in a target population— how likely or unlikely it is that an individual other than the defendant has the same DNA bands as those found at the crime scene and in defendant's blood. *People v Barney*, 8 Cal App 4th 798, 809; 10 Cal Rptr 2d 731 (1992). This process involves a comparison of each pair of matching bands to a data base composed of persons of a given race in a particular geographic location.

> "The probability of the combination of two particular bands recognized by one of the probes is calculated by multiplying the product of the frequencies

---

[2] For a detailed explanation of DNA and RFLP analysis, see *United States v Jakobetz*, 955 F2d 786, 792-793 (CA 2, 1992), *People v Axell*, 235 Cal App 3d 836, 845-848; 1 Cal Rptr 2d 411 (1991), and *People v Castro*, 144 Misc 2d 956, 964-970; 545 NYS2d 985 (1989).

of the two bands by two. The probability of the band patterns from all four loci is determined by multiplying the products from all four loci. This is known as the 'product' or multiplication rule." [*People v Adams,* 195 Mich App 267, 273-275; 489 NW2d 192 (1992), quoting *People v Axell,* 235 Cal App 3d 836, 847; 1 Cal Rptr 2d 411 (1991).]

Lisa Forman, Ph.D., a population geneticist for Cellmark, calculated the chances that a third party possessed the same banding patterns as one in twenty-two million. FBI agent Laurence Presley found a two-band match. He testified that the statistical probability of a two-band match was one in 4,800. Population geneticist Ranajit Chakraborty testified that the Cellmark and FBI estimates were conservative. He calculated the chances of a match at one in 127,000,000.

In *Adams,* this Court considered expert testimony and a Congressional Office of Technology Assessment report presented at a *Davis/Frye* hearing on the admissibility of RFLP DNA testing. *Adams* held that DNA identification evidence is generally accepted in the scientific community and that Michigan courts could thereafter take judicial notice of DNA identification or DNA matching evidence, *supra* at 277. However, before a court admits such evidence, the prosecution must show that generally accepted laboratory procedures were followed. *Adams* also held that the "product rule" method of analyzing DNA matching evidence —DNA statistical evidence—is admissible and any attack on this evidence is relevant to its weight, *supra* at 279.

Just as *Adams* was decided, a debate erupted in the scientific community concerning DNA statistical evidence. A leading scientific journal, *Science,* published two articles demonstrating an apparent disagreement among population geneticists about

the phenomenon known as substructuring or subgrouping in populations. See Lewontin & Hartl, *Population Genetics in Forensic DNA Typing,* and Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work,* Science (December 20, 1991). Shortly thereafter, the National Research Council (NRC) released a report acknowledging the controversy concerning statistical analysis. Instead of resolving the dispute, the NRC report assumed that substructuring existed and suggested a modified conservative "ceiling" approach that gives the benefit of doubt to defendants until the controversy is resolved. *People v Amundson,* 34 Cal App 4th 1151; 41 Cal Rptr 2d 127 (1995); *Taylor v State,* 889 P2d 319, 335-336 (Okla Crim App, 1995).

Defendant contends that because neither Cellmark nor the FBI used the conservative ceiling approach in its statistical analyses, the trial court erred in admitting the results into evidence. Defendant relies on several cases in other jurisdictions that adopted the NRC report. See, e.g., *People v Barney, supra; Commonwealth v Lanigan,* 413 Mass 154; 596 NE2d 311 (1992); see also *People v Wallace,* 14 Cal App 4th 651; 17 Cal Rptr 2d 721 (1993). Defendant also contends that because the statistical analysis evidence is necessary to understand the DNA matching results, the matching results must also be excluded from evidence. *Barney, supra; Taylor, supra* at 337, n 81.

Most recently, Eric S. Lander and Bruce Budowle definitively resolved the controversy over DNA statistical evidence. Lander & Budowle, *DNA Fingerprinting Dispute Laid to Rest,* Nature (October 27, 1994); *Amundson, supra; Taylor, supra; Lindsey v People,* 892 P2d 281 (Colo, 1995). The recent article indicates that the product rule method of DNA statistical evidence is now gener-

ally accepted in the relevant scientific community.[3] Accordingly, we reject defendant's arguments and reaffirm our decision in *Adams*. Courts of this state may continue to take judicial notice of the admissibility of the RFLP method of DNA testing, including the statistical analysis. However, as noted in *Adams, supra,* the prosecution must first establish that generally acceptable laboratory procedures were followed before the court admits DNA evidence.

Defendant also argues that DNA statistical analysis evidence must survive scrutiny under the *Davis/Frye* test. Defendant contends that *Adams* did not subject the statistical analysis portion of the testing to *Davis/Frye* and thus it was erroneously decided. Similarly, the trial court in the present case did not apply a *Davis/Frye* test. As noted, every jurisdiction that has considered this question since the Lander & Budowle article, including those states that have *Frye*-type tests, has concluded that DNA statistical evidence satisfies the *Frye* test. Although defendant correctly notes that *Adams* did not specifically subject the challenged evidence to a *Davis/Frye* test, we conclude that such an examination was unnecessary. *Adams* held that challenges to the statistical evidence is relevant to its weight, not its admissibility, *supra* at 279. Given the split of authority regarding this issue,[4] we adhere to and reaffirm *Adams*. The trial

[3] Before the Lander & Budowle article, Eric Lander had been a leading opponent of the product rule method of DNA statistical analysis. That article noted that "conservative calculations have had no noticeable impact on the use of DNA evidence." *Taylor, supra* at 338, n 84, quoting Lander & Budowle.

[4] See *People v Wesley,* 83 NY2d 417, 427-428; 611 NYS2d 97; 633 NE2d 451 (1994); *Springfield v State* 860 P2d 435, 447 (Wyo, 1993); *State v Montalbo* 73 Hawaii 130, 146; 828 P2d 1274 (1992); *Lindsey, supra; Taylor, supra; People v Wilds,* 31 Cal App 4th 636; 37 Cal Rptr 2d 351 (1995); *People v Soto,* 30 Cal App 4th 340; 35 Cal Rptr 2d 846 (1994).

court did not abuse its discretion in admitting the DNA statistical evidence.

### IV. PROBABLE CAUSE: FACTUAL OMISSIONS IN THE SEARCH WARRANT AFFIDAVIT

Defendant next contends that the trial court erred in denying his motion to suppress evidence seized pursuant to a search warrant because the supporting affidavit contained material omissions. We disagree. In reviewing a magistrate's decision that an affidavit supporting a search warrant established probable cause, this Court "ask[s] only whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *People v Russo,* 439 Mich 584, 604; 487 NW2d 698 (1992), citing *Illinois v Gates,* 462 US 213, 238; 103 S Ct 2317; 76 L Ed 2d 527 (1983). Probable cause exists where a person of reasonable caution would conclude that contraband or evidence of criminal conduct will be found in the place to be searched. *Gates, supra; Russo, supra* at 606-607.

In *Franks v Delaware,* 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978), the Supreme Court held that where an affidavit in support of a search warrant contains false statements made knowingly or recklessly, evidence obtained pursuant to that warrant must be suppressed if the false information was necessary to a finding of probable cause. To prevail on a motion to suppress evidence, the defendant must show by a preponderance of the evidence that the affiant knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to a finding of probable cause. *People v Stumpf,* 196 Mich App 218, 224; 492 NW2d 795 (1992). This Court ex-

tended *Franks* to material omissions in *People v Kort,* 162 Mich App 680, 685-686; 413 NW2d 83 (1987); *Stumpf, supra.*

In this case, defendant asserts that Detective Wesolowski knowingly or recklessly omitted the following facts from his affidavit: (1) that the room in which the sexual assault occurred was dark; (2) that the victim chose two photographs that looked like her assailant from a photographic show up that contained only six photos; (3) that the victim described her attacker as approximately five feet ten inches tall and in his early twenties; and (4) that defendant always wore facial hair.

First, defendant has failed to show by a preponderance of the evidence that Detective Wesolowski knowingly and intentionally, or with reckless disregard for the truth, omitted material information from the affidavit. At the hearing to determine the factual basis of the search warrant affidavit, Detective Wesolowski testified that his affidavit was based on information that he received directly from other police investigators, as well as the victim's account of the incident. Defendant has not cited any evidence that shows that the detective knowingly or intentionally omitted the facts enumerated by the defendant. Nor does a review of the relevant transcripts show that Detective Wesolowski recklessly disregarded the truth. As a result, defendant has failed to satisfy his burden of proof under *Franks, supra.*

In any event, defendant has not shown that the allegedly omitted information eroded the magistrate's finding of probable cause. Even if the omitted facts are considered, probable cause still existed to support the search warrant. The affidavit stated that the crime occurred at approximately 3:00 a.m. in the victim's bedroom, that the victim

observed her attacker's facial features, and thereafter she described him as

> a black male, approximately 5'10", approximately 175 lbs., wearing dark clothing (blue or black) being a sweatshirt or cotton jacket (bulky), cotton work pants, a dark knit close fitting hat, did not wear glasses, did not appear to have facial hair, wore bulky gloves (ski type) throughout the assault.

In addition, the affidavit stated that the victim had identified photographs of two men from a photographic show up as possibly depicting her assailant. One of the men was defendant; the police had eliminated the other man as a suspect. From the long-term police surveillance of defendant, the affiant learned that defendant frequented the area where the sexual assaults occurred. He believed that defendant fit the victim's description.

None of the allegedly omitted facts obviates the showing of probable cause in the affidavit. First, Detective Wesolowski's sworn testimony contradicted defendant's claim that he always wore facial hair. Wesolowski had observed that defendant was clean shaven about two months before the November 9, 1989, attack. As a result, the alleged omission would have had no bearing on the finding of probable cause. Next, defendant claims that the victim's statement that her assailant was five feet ten inches contradicted police information regarding defendant's height. On the contrary, police reports of defendant's height ranged between five feet four inches and five feet nine inches. The victim's description of her assailant as one inch taller than the highest estimate of defendant's height in police reports does not materially alter the affiant's representation that defendant fit the victim's description.

Further, the characterization of the victim's bedroom as dark and the victim's statement that she could not get a good look at her assailant's face were unnecessary to the finding of probable cause. The affidavit stated that the victim awoke about 3:00 A.M. to find an intruder in her bedroom. That the room was in darkness is an obvious deduction from the time of the attack and the victim's inability to identify her attacker. Moreover, regardless of the number of photographs in the show up, the victim chose defendant's picture. Finally, the victim's statement that her assailant was in his twenties does not negate her identification and the general description she gave to police. In light of defendant's contention that the room was very dark, the mischaracterization of his age is immaterial. The alleged omissions of material facts did not undermine the basis for the magistrate's finding of probable cause.

### V. SENTENCING

Defendant also contests the validity of his twenty-five- to sixty-year term of imprisonment in Docket No. 151287. First, defendant contends that the sentencing court erred in stating that the sentencing guidelines do not apply to habitual offender convictions. We disagree. Although they provide a useful starting point, the sentencing guidelines do not apply to habitual offender convictions. *People v Cervantes,* 448 Mich 620; 532 NW2d 831 (1995); *People v Martin,* 209 Mich App 362; 531 NW2d 755 (1995). We see no error.

Next, we reject defendant's claim that his sentence violates the principle of proportionality. The applicable habitual offender statute enhanced defendant's potential sentence to a maximum penalty of life imprisonment or a lesser term. MCL

769.12(1)(a); MSA 28.1084(1)(a). Defendant's twenty-five- to sixty-year term represents a proportionate enhancement of his sentence for the underlying conviction of assault with intent to commit criminal sexual conduct. Defendant broke into the victim's home while she was asleep, threatened to "blow her brains out" if she angered him, attempted to penetrate her vaginally and orally, and eventually ejaculated on her chest. Defendant's history of criminal behavior includes a rape conviction and the conviction of first-degree criminal sexual conduct in Docket No. 144968. Defendant's sentence is entirely proportionate to the seriousness of the offense and the circumstances of this offender. *People v Houston,* 448 Mich 312; 532 NW2d 508 (1995); *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990).

Finally, defendant claims that his habitual offender sentence unconstitutionally punishes him for his status as an habitual criminal in Docket No. 144968. Defendant's claim is without merit. A defendant's habitual offender conviction is based on additional particular criminal acts, not his status as an habitual criminal. *People v Curry,* 142 Mich App 724, 732; 371 NW2d 854 (1985).

Affirmed.