PEOPLE v LEONARD

Docket Nos. 178121, 186776. Submitted June 11, 1997, at Grand Rapids.
    Decided July 18, 1997, at 9:00 A.M. Leave to appeal denied, 456 Mich
    888.

Orlandus C. Leonard was convicted following a bench trial in the
    Kalamazoo Circuit Court, John F. Foley, J., of first-degree criminal
    sexual conduct, two counts of armed robbery, and breaking and
    entering an occupied dwelling with intent to commit larceny. He
    was sentenced to concurrent sentences of eighteen to forty years
    for the criminal sexual conduct conviction, ten to thirty years for
    each armed robbery conviction, and four to fifteen years for the
    breaking and entering conviction. The defendant appealed as of
    right from the convictions and sentences. (Docket No. 178121). The
    trial court granted the defendant's motions for a new trial and to be
    released on bond. The prosecution appealed by leave granted from
    those orders. (Docket No. 186776). The appeals were consolidated.

    The Court of Appeals *held*:

    1. The trial court abused its discretion in granting the defendant's
    motion for a new trial without allowing the prosecution adequate
    time to respond to the defendant's sixty-three-page brief in support
    of the motion.

    2. The trial court erred in granting the defendant a new trial on
    the basis that the defendant did not have an expert at trial to tes-
    tify regarding the deoxyribonucleic acid (DNA) identification evi-
    dence presented by the prosecution. To be entitled to the appoint-
    ment of an expert, a defendant must show a nexus between the
    facts of the case and the need for an expert. A defendant is entitled
    to the appointment of an expert, other than a psychiatric expert, at
    public expense only if the defendant cannot otherwise safely pro-
    ceed to trial without the expert. The trial court erred in holding
    that whenever DNA evidence is offered against a defendant, the
    defendant is entitled to a DNA expert at trial.

    3. Defense counsel's request for the appointment of a DNA expert
    was untimely, the request was properly denied, and the denial did
    not render the defendant's trial fundamentally unfair.

    4. To the extent that the defendant raised a claim of ineffective
    assistance of counsel on the basis of not having a DNA expert, the

record does not reflect that defense counsel's performance was deficient or that the defendant was prejudiced by defense counsel's performance.

5. None of the defendant's challenges to the reliability of the DNA evidence have merit.

6. The defendant's belated claim of an alibi is not believable.

7. Evidence regarding the defendant's criminal background and use of controlled substances was properly admitted at trial. Defense counsel's failure to object to the admission of such evidence was not ineffective assistance.

8. Although the prosecution may have improperly elicited from a witness that the defendant was a Muslim, error requiring reversal did not occur.

9. The trial court's questioning of the defendant with regard to his waiver of the right to a jury trial was sufficient.

Convictions and sentences affirmed; orders granting a new trial and releasing the defendant on bond vacated.

1. CRIMINAL LAW — WITNESSES — EXPERT WITNESSES — APPOINTMENT — DUE PROCESS.

A defendant is entitled to the appointment of an expert, other than a psychiatric expert, at public expense only if the defendant cannot otherwise proceed safely to trial without the expert; the defendant must show a nexus between the facts of the case and the need for an expert in order to be entitled to the appointment of an expert; a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.

2. CRIMINAL LAW — WITNESSES — EXPERT WITNESSES — APPOINTMENT — DUE PROCESS.

An indigent defendant will not be found to have been denied due process as a result of not having the assistance of an expert in preparing and presenting a case unless the indigent made a timely request to the trial court for the provision of expert assistance, the court improperly denied the request, and the denial rendered the defendant's trial fundamentally unfair.

3. CRIMINAL LAW — EVIDENCE.

Novel scientific evidence must be shown to have gained general acceptance in the scientific community to be admissible at trial, and the party offering the evidence has the burden of demonstrating its acceptance in the scientific community; a party need not show the general acceptance of an already established test, and

independent validation is not necessary where no scientific dispute exists with regard to the testing protocol.

4. CRIMINAL LAW — EVIDENCE — DNA IDENTIFICATION.

The restriction fragment length polymorphism method of deoxyribonucleic acid testing and the modified ceiling approach and the product rule method of statistical analysis for DNA matches are generally accepted in the scientific community; Michigan courts may take judicial notice of the reliability of these methods and admit into evidence the results of tests employing these methods where the prosecution shows that generally accepted laboratory procedures have been followed; challenges to such statistical evidence are relevant with regard to the weight to be given the evidence but not to its admissibility; for their results to be admissible, scientific tests need not be infallible but reasonable certainty must follow from them.

5. CRIMINAL LAW — WITNESSES — RELIGIOUS BELIEFS.

Questioning a witness with regard to the witness' religious beliefs or opinion or to explore another individual's religious opinions and beliefs is forbidden during a criminal proceeding (MRE 610; MCL 600.1436; MSA 27A.1436).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *James J. Gregart*, Prosecuting Attorney, and *Judith B. Ketchum*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *F. Michael Schuck*), for the defendant on appeal.

Before: REILLY, P.J., and HOOD and MURPHY, JJ.

HOOD, J. Defendant was convicted, following a bench trial, of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), two counts of armed robbery, MCL 750.529; MSA 28.797, and breaking and entering an occupied dwelling with intent to commit larceny, MCL 750.110; MSA 28.305. He was sentenced to eighteen to forty years' imprisonment for the criminal sexual conduct conviction, ten to thirty years' imprisonment for each armed robbery conviction, and

four to fifteen years' imprisonment for the breaking and entering conviction, the sentences to be served concurrently. In Docket No. 178121, defendant appeals his sentences and convictions as of right. In Docket No. 186776, the prosecution appeals by leave granted the trial court's order granting defendant a new trial. The appeals were consolidated. We affirm defendant's convictions and sentences and vacate the trial court's orders granting defendant a new trial and releasing the defendant on bond.

On August 30, 1986, two unidentified men broke into an apartment in Kalamazoo in which a woman, her boyfriend, and her five-year-old daughter were sleeping. The victims testified that they were awakened when one of the men put a knife to the male victim's throat or back and demanded money. The men took the male victim out of the bedroom, blindfolded him, tied his hands with a vacuum sweeper cord, and placed him in a closet in another room. The female victim testified that when the two men left the bedroom, she locked the door, screamed, and attempted to escape through a window, but one of the men kicked in the door. One man instructed the female victim to follow instructions or her child would be hurt. The child was told to cover her face with blankets. The female victim testified that one man then put her face down on the bed and vaginally raped her from behind. The man then placed a pillowcase over her head and walked her into the bathroom, where the other intruder forced her to engage in oral sex and then vaginally raped her from behind. Both men ejaculated in the victim. The man who last raped the victim placed the victim and her child in the bathtub after tying their hands.

The male victim testified that he heard the men ransacking the apartment. One man repeatedly returned to him ranting and raving, demanding money, drugs, and liquor, and threatening to kill all the victims. The female victim testified that, after it was quiet, she untied her hands and the other victims' hands. The victims immediately called the police. The female victim was rushed to the hospital, where she underwent a sexual assault evaluation. The seminal fluid samples taken from the victim were sent to the Michigan State Police (MSP) crime laboratory. The police found several fingerprints at the crime scene but were unable to make a match at that time. All potential suspects the police considered at the time were eliminated, the victim's vaginal samples were frozen, and the case was placed on inactive status in 1987, pending new information.

In February 1991, after reanalyzing the latent fingerprints found at the crime scene, the MSP lab identified several of the prints as belonging to Eric Schippers. Kalamazoo Township Police Officer David Caswell testified that Schippers was located in August 1991, interviewed, and ultimately arrested in August 1992. Blood samples were taken from Schippers and a positive match was made of his deoxyribonucleic acid (DNA) with some of the DNA found in the samples extracted from the female victim. Schippers positively and unequivocally identified defendant as the other perpetrator involved in the crimes. Schippers' description of the events surrounding the crimes generally comported with that of the victims.[1]

---

[1] The prosecutor's office negotiated a plea agreement with Eric Schippers for his cooperation, in return for a sentencing recommendation of twelve to thirty years' imprisonment, which Schippers ultimately received.

Upon defendant's arrest in August 1992, a sample of his blood was taken, and his DNA matched the seminal fluids taken from the victim when she underwent the sexual assault evaluation. Defendant was released on bond and granted an adjournment of trial "due to need for expert research and testimony." On December 1, 1992, defense counsel filed a motion to suppress the DNA identification evidence. Hearings regarding the motion and the trial were adjourned several times. During that period, defense counsel retained Dr. Benjamin Grunbaum of California to review the DNA evidence.

At the suppression hearing, the prosecution presented three experts: Dr. Julie Howenstein, who performed the DNA tests at the MSP lab; Charles Barna, supervisor of the MSP lab DNA unit; and Dr. Paul Coussens of Michigan State University, who directs his own molecular biology, molecular virology, and molecular genetics lab , and who was presented as an independent expert on DNA testing procedures.

Dr. Howenstein explained DNA and the restriction fragment length polymorphism (RFLP) DNA testing procedures utilized by the lab, which are a slightly modified version of the Federal Bureau of Investigation's protocol.[2] Dr. Howenstein used five probes in this case and tested three male donors: the female victim's boyfriend, Schippers, and defendant. The DNA evidence indicated that there was more than one semen donor. There was a definite match of defendant's DNA on three of the probes, and a match on the other two

---

[2] For an explanation of DNA testing and RFLP analysis, see *People v Adams*, 195 Mich App 267, 270-273; 489 NW2d 192 (1992), modified on other grounds 441 Mich 916 (1993), and anno: *Admissibility of DNA identification evidence*, 84 ALR4th 313.

probes could not be excluded. Based upon a three-probe match, the DNA pattern that resulted was one that is found in approximately 1 of every 59,000 people. In discussing the MSP lab's proficiency, Dr. How-enstein indicated that in ten independent proficiency exams conducted on the MSP lab and its personnel, which occurred every three months by Cellmark Labs, no errors regarding the lab's proficiency were documented. Barna stated that he reviewed Dr. How-enstein's lab work and independently evaluated the DNA tests and the calculations.

Dr. Coussens agreed with the three-probe match determined by Dr. Howenstein. He further opined that the statistical result of 1 in 59,000 for this DNA pattern was conservative. Dr. Coussens testified that the RFLP protocol applied in this case was well above norms for quality control and quality assurance. According to Dr. Coussens, the techniques used are firmly established and accepted in the scientific community, and any possible error in the analysis would make the result more conservative (i.e., favoring defendant). Dr. Coussens found nothing improper in either the procedure or the analysis of the data by the MSP lab in this case.

Following the expert testimony, defense counsel requested authorization to hire a DNA expert to review the testimony and exhibits. The court authorized defense counsel to retain an expert at the court's top rate of $125 an hour, but found that Dr. Grunbaum's fees and planned hours were excessive. The court noted that the case had been pending for years, the hearing regarding the suppression motion had been adjourned many times at the request of defense counsel, and that it was planning to proceed.

On May 10, 1994, defense counsel presented a written waiver of jury trial signed by defendant, which the trial court accepted. On May 11, 1994, before commencement of trial, the court continued the DNA suppression hearing. Defense counsel advised the court that the fee being requested by Dr. Grunbaum remained in excess of the fee authorized by the court and that defense counsel was unable to obtain another DNA expert. Defense counsel requested that the court deny the admissibility of the DNA evidence on the basis of his cross-examination of the expert witnesses and because *People v Adams*, 195 Mich App 267; 489 NW2d 192 (1992), modified on other grounds 441 Mich 916 (1993), was wrongly decided. The trial court denied defendant's motion.

Defendant and Schippers testified at trial, and the DNA expert testimony was admitted by stipulation of the parties. In addition, Dr. Patrick Conneally, a population geneticist from Indiana University Medical Center, testified regarding his review of the RFLP procedures and statistical analysis performed in this case. Dr. Conneally opined that the three-probe match was highly significant and agreed that a match of defendant was not excluded on the other bands. In fact, Dr. Conneally would have declared a match on all bands. He further testified that the MSP lab produces an excellent quality of work that is equal to or better than the national labs.

Defendant testified in his own behalf, he indicated that he lived in Three Rivers with his mother between 1983 and 1986; he would have been twenty years old in 1986. Defendant claimed that he did not know Schippers. He admitted that he had seen Schippers in Three Rivers and that he had worked with Schippers'

cousin at a local restaurant. Defendant lived in Florida from 1986 to 1990, and then moved to Chicago, where he remained with his wife and three children. Defendant claimed that, despite conferences with his wife and mother, he could not pinpoint his whereabouts on August 30, 1986.

Defendant was convicted of all counts. Defendant's appellate counsel filed a motion (with no brief in support) for a new trial on December 5, 1994. Defendant argued that he was denied due process because the court failed to appoint a DNA expert and denied defendant a continuance to obtain an expert. He further claimed that defense counsel was ineffective because he failed to obtain a DNA expert and failed to contact and call any alibi witnesses. He finally asserted that his jury waiver was involuntary. Hearings regarding the motion were adjourned at least twice. On May 26, 1995, defendant filed a sixty-three-page brief in support of the motion for a new trial. The hearing was held on June 6, 1995, and the court granted defendant a new trial, finding that defendant was "entitled" to a DNA expert at trial.

Over the objections of the prosecutor, on June 19, 1995, the court granted defendant release on bond. The trial court subsequently denied the prosecutor a stay of proceedings pending an application for leave to appeal to this Court. After granting leave to appeal, this Court, Sawyer and Hoekstra, JJ. (Neff, P.J., dissenting), entered an order on September 18, 1995 (Docket No. 178121) that remanded the case to the circuit court for reconsideration of the motion granting defendant release on bond. On remand, the circuit court continued defendant's bond.

I

The prosecution argues that the trial court abused its discretion in granting defendant's motion for a new trial without allowing the prosecution adequate time to respond to defendant's sixty-three-page brief in support of the motion. We agree. The trial court's decision regarding a motion for a new trial is reviewed for an abuse of discretion. *People v Herbert*, 444 Mich 466, 477; 511 NW2d 654 (1993).

MCR 2.119(A)(2) provides, in relevant part:

> A motion or response to a motion that presents an issue of law must be *accompanied* by a brief citing the authority on which it is based. *Except as permitted by the court, the combined length of any motion and brief*, or of a response and brief, *may not exceed 20 pages* double spaced, exclusive of attachments and exhibits.

In this case, defendant's motion was filed on December 5, 1994, and the brief in support was filed nearly six months later. Accordingly, defendant's brief did not accompany the motion.[3] Further, defendant's motion and brief were a combined length of sixty-six pages. Yet, defendant did not request permission to file this excessive-length brief until one day before the hearing. The trial court denied the prosecution's motion to strike defendant's untimely and excessive-length brief, and granted defendant permission to file the excessive-length brief *during the hearing*, finding that the matter was "very complicated," a pronouncement that signals that the prosecution was entitled to an opportunity to analyze and respond to the brief.

---

[3] The court rules do not define "accompany," however, it is generally defined as "to go along or in company with" or "to exist or occur in association with." *Random House Webster's College Dictionary* (1995), p 9.

MCR 2.119 was amended in 1991 in part to include a twenty-page limitation on motions and briefs to facilitate better preparation for hearings regarding the motions. 1 Martin, Dean & Webster, Michigan Court Rules Practice (1996 Supp), p 217. Thus, although an excessive-length brief was justified in this case, given the purpose of the amendment and the trial court's own observation regarding the matter being "very complicated," the prosecution did not have an adequate amount of time to prepare for and respond to defendant's lengthy and complex brief.

Likewise, the prosecution was deprived of an opportunity to respond orally to defendant's arguments because the trial court stopped the prosecution's argument during the hearing and gave its ruling. Although a court has the discretion to limit oral argument regarding motions, MCR 2.119(E)(3), the prosecution was simply not afforded an adequate opportunity to respond to defendant's brief and arguments in support of the motion, either by brief or oral argument. The trial court abused its discretion in this regard.

II

The prosecution next argues that the trial court abused its discretion in granting defendant a new trial because defendant did not have a DNA expert at trial. In essence, the trial court concluded that, under due process principles, whenever DNA evidence is offered against a defendant, the defendant is *entitled* to a DNA expert at trial; thus, the court concluded that defendant was entitled to a new trial where he would have a DNA expert. We find that the trial court's reasoning was error.

MCR 6.431(B) states:

> Reasons for Granting. On the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice. The court must state its reasons for granting or denying a new trial orally on the record or in a written ruling made a part of the record.

Again, the trial court's decision regarding a motion for a new trial is reviewed for an abuse of discretion. *Herbert, supra* at 477. This Court's review, however, requires us to examine the reasons given by the trial court for granting a new trial in order to determine if the court abused its discretion. *People v Bart (On Remand)*, 220 Mich App 1, 11; 558 NW2d 449 (1996). Where the reasons given by the trial court are inadequate or not legally recognized, the trial court abused its discretion. *Id.* at 15; *Petraszewsky v Keeth (On Remand)*, 201 Mich App 535, 539-543; 506 NW2d 890 (1993).

Under the Due Process Clause, states may not condition the exercise of basic trial and appeal rights on a defendant's ability to pay for such rights. *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985); *Britt v North Carolina*, 404 US 226, 227; 92 S Ct 431; 30 L Ed 2d 400 (1971); *Griffin v Illinois*, 351 US 12, 17-19; 76 S Ct 585; 100 L Ed 891 (1956). Indigent defendants, however, need not be provided with *all* the assistance that wealthier defendants might buy, but fundamental fairness requires that the state not deny them " 'an adequate opportunity to present their claims fairly within the adversary system.' " *Moore v Kemp*, 809 F2d 702, 709 (CA 11, 1987), cert

den 481 US 1054 (1987), quoting *Ross v Moffitt*, 417 US 600, 612; 94 S Ct 2437; 41 L Ed 2d 341 (1974).

In *Ake, supra*, a case involving an insanity claim, the Supreme Court concluded that the Due Process Clause guarantee of fundamental fairness is implicated "when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial [; at that point] the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake, supra* at 83.

The principle in *Ake* did not create a universal rule that an indigent defendant is entitled to an expert for every scientific procedure, see *Vickers v Arizona*, 497 US 1033; 110 S Ct 3298; 111 L Ed 2d 806 (1990). Some jurisdictions, however, have expanded the *Ake* principle beyond the assistance of psychiatric experts.[4] Of particular relevance to this case, only two courts have held that whenever the prosecution intends to introduce DNA evidence against a defendant at trial, the defendant has a due process right to an appointment of a DNA expert to assist in his defense. *Dubose v State*, 662 So 2d 1189, 1197 (Ala, 1995), and *Polk v State*, 612 So 2d 381 (Miss, 1992).

The vast majority of jurisdictions require a specific showing of need for the expert. See, for example, *Caldwell v Mississippi*, 472 US 320, 323-324, n 1; 105 S Ct 2633; 86 L Ed 2d 231 (1985); *Moore, supra*;

---

[4] See, for example, *Little v Armontrout*, 835 F2d 1240 (CA 8, 1987), cert den 487 US 1210 (1988); *State v Bridges*, 325 NC 529; 385 SE2d 337 (1989); *State v Moore*, 321 NC 327; 364 SE2d 648 (1988); *Thornton v State*, 255 Ga 434; 339 SE2d 240 (1986).

*Husske v Commonwealth*, 252 Va 203, 211; 476 SE2d 920 (1996), cert den ___ US ___; 117 S Ct 1092; 137 L Ed 2d 225 (1997), and the cases cited therein. The Eleventh Circuit Court of Appeals, in reasoning that we find persuasive, explained:

> [A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. [*Moore, supra* at 712.]

An indigent defendant in Michigan is also entitled to an independent psychiatric evaluation by a clinician of his choice. MCL 768.20a(3); MSA 28.1043(1)(3). However, consistent with the majority of courts, other than psychiatric experts, a defendant is entitled to the appointment of an expert at public expense only if he cannot otherwise proceed safely to trial without the expert. MCL 775.15; MSA 28.1252. In other words, a defendant must show a nexus between the facts of the case and the need for an expert. *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995). Accordingly, the instant trial court's reasoning and conclusion that defendant was *entitled* to a DNA expert at trial and, thus, is entitled to a new trial was error.

In any event, assuming that defendant should have had a DNA expert at trial but was erroneously deprived of one, either through ineffective assistance of counsel or through trial court error, it was incum-

bent on the trial court to determine if defendant was prejudiced and received a fundamentally unfair trial as the result of not having expert assistance. See *People v Mateo*, 453 Mich 203, 214-215; 551 NW2d 891 (1996); *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994); *People v Young (After Remand)*, 425 Mich 470, 501; 391 NW2d 270 (1986). The instant trial court engaged in no such analysis and made no such determination The trial court's analysis is particularly important in this case where, although defense counsel raised questions below and on appeal regarding the reliability of the testing, defendant offered only mere speculation regarding the unreliability of the testing. See *People v Young*, 418 Mich 1; 340 NW2d 805 (1983).

Having concluded that the lack of a DNA expert at trial, per se, did not deprive defendant of due process, we address defendant's arguments that he was prejudiced by the lack of an expert.

A

Defendant asserts that he was "entitled to appointment of an expert on this extremely complex scientific evidence, which counsel could not understand without the aid of an expert," and that the trial court's refusal to appoint Dr. Grunbaum left defendant without a necessary expert. We disagree.

In support of this argument, defendant primarily relies on *Dubose, supra,* and *Polk, supra,* which, as previously stated, are two cases that held that a defendant against whom DNA evidence will be offered must have access to a DNA expert to assist him in his defense. We, however, have already concluded that a

defendant is not entitled to a DNA expert without making a particularized showing of a need for the expert.[5]

Further, as noted by the Eleventh Circuit Court of Appeals, a defendant has responsibilities attendant to establishing the need for an expert:

> [A]n indigent defendant who did not have the assistance of an expert in preparing and presenting his case cannot be heard to complain about his conviction on due process grounds *unless he made a timely request to the trial court for the provision of expert assistance, the court improperly denied the request, and the denial rendered the defendant's trial fundamentally unfair.* [*Moore, supra* at 710 (emphasis added).]

Here, defense counsel's request was untimely, the request was properly denied, and the denial did not render defendant's trial fundamentally unfair. The tests were performed in August 1992. Defendant did not request appointment of a DNA expert until March 8, 1994, the date of the suppression hearing, and the request was not made until after the prosecution had presented its DNA experts at the hearing. Defense counsel did not request an adjournment of the trial to locate an expert, even though the trial was then scheduled to begin in three weeks. The trial was again adjourned, finally began two months later, and

---

[5] We note that in reaching its conclusion, the *Dubose* court relied heavily on the case of *Husske v Commonwealth*, 19 Va App 30; 448 SE2d 331 (1994), which held that the state was required to provide the assistance of a DNA expert to a defendant. The decision in *Husske*, however, was vacated in a rehearing of the case en banc, 21 Va App 91; 462 SE2d 120 (1995). The Virginia Supreme Court affirmed the trial court's refusal to appoint a DNA expert where the defendant had made only generalized assertions, similar to the ones made in this case, that "DNA evidence is 'of a highly technical nature' " and it is difficult for a lawyer to challenge DNA evidence without expert assistance. *Husske v Commonwealth, supra*, 252 Va 213. The defendant's conviction was affirmed. *Id.* at 217.

defense counsel still had not located an expert. Defense counsel asked for a continuance *to have more time to gather evidence for the motion to suppress,* but stated that he otherwise was ready to proceed to trial.[6]

More importantly, defense counsel did not file a formal motion for an expert. Rather, he made only generalized assertions of his need, and did not indicate that he required expert assistance to cross-examine the prosecution's experts. Indeed, contrary to defendant's assertions on appeal, defense trial counsel exhibited an understanding of the scientific evidence, and effectively and comprehensively cross-examined the prosecution's experts. Defense counsel's undergraduate degree is in chemistry with a minor in biophysics. Defense counsel requested a copy of all the documents, trial exhibits, and researchers' notes surrounding the DNA analysis in this case and apparently personally toured the MSP lab. Defense counsel was familiar with the major research publications and cases regarding DNA analysis and effectively and extensively cross-examined the experts in that regard, specifically noting the National Research Committee report, a seminal document concerning DNA. Defense counsel seemed to have a detailed understanding of the concepts involved in DNA testing, specifically the RFLP testing technique, and was quite knowledgeable regarding terminology, specific procedures, and potential problems and areas

---

[6] We note that although defendant asserts that the trial court abused its discretion in denying a continuance to allow defendant to locate an expert, defense counsel did not request a continuance specifically to have more time to locate a DNA expert. Therefore, no discretion of the trial court was invoked regarding this specific matter for this Court to review.

of controversy surrounding both the DNA tests and the statistical analysis of the tests. For example, as a result of defense counsel's questions on cross-examination, Dr. Conneally admitted that, while no two people have the same fingerprint, it is possible for two people to have the same DNA print. Accordingly, the lack of an expert did not render defendant's trial fundamentally unfair.

To the extent that defendant raised a claim of ineffective assistance of counsel on the basis of not having a DNA expert, the record does not reflect that defense counsel's performance was deficient or that defendant was prejudiced by defense counsel's performance. *Pickens, supra* at 303.

B

Defendant also raises several issues challenging the reliability of the DNA evidence, none of which we find meritorious.

(1)

Defendant contends that the RFLP method of DNA testing is being replaced by polymerase chain reaction (PCR)-based methods. In *People v Lee*, 212 Mich App 228, 282-283; 537 NW2d 233 (1995), this Court determined that there was a general acceptance in the scientific community for the PCR method of DNA analysis. This Court compared the PCR method with the RFLP method and concluded that "[t]he great advantage of the PCR method compared to the RFLP method is that it is much quicker and may be used on much smaller samples of DNA, such as hair samples." *Id.* at 267. The results of PCR testing are also easier to interpret than the results of RFLP analysis. *Id.* at 268.

A disadvantage of the PCR method, when compared to the RFLP method, however, is that only one probe or locus is analyzed, while there are generally at least four probes that are viewed with the RFLP method. *Id.* The Court concluded that "*[t]he possibility of distinguishing individuals is much lower with the PCR* method than with the RFLP method." *Id.* (emphasis added). This Court further concluded that "[w]hile the PCR method is conclusive in excluding persons or suspects, its use in an analogous manner to the RFLP method in affirmatively identifying suspects must proceed with considerable caution, with the factfinder being carefully apprised of its inherent limitations." *Id.*

Accordingly, while the RFLP method is apparently being replaced in those cases where there is only a small sample or one that is degraded or contaminated, none of those considerations are present in this case. Moreover, contrary to defendant's assertions, the RFLP method is a more reliable and precise method of identification and it is not being replaced by the PCR method because of a lack of reliability.

(2)

Defendant raises several issues disputing the reliability of the testing procedures. Defendant asserts that the DNA testing procedures utilized in this case were "certainly challengeable by defense in cross-examination." We agree and, again, note the procedures *were* challenged by defense counsel.

Defendant further asserts that a defense expert should have examined the "inconclusive" autorads to determine if, in fact, they excluded defendant. However, Dr. Coussens, an independent expert, agreed

with the two MSP lab scientists that two of the probes, while not declared a match, were consistent with defendant's DNA band pattern and definitely did not exclude him. Indeed, Dr. Conneally, the independent population geneticist, testified that he would have declared all five band patterns a match.

Defendant contends that "there is a serious dispute as to whether a 3-probe match without admissible frequency data is strong evidence of identity." In support of this assertion, defendant presented only Dr. Grunbaum's statement regarding this "controversy," with no studies, research, or cases being cited in support. A party may not merely announce a position and leave it to us to discover and rationalize the basis for the claim. *Goolsby v Detroit*, 419 Mich 651, 655, n 1; 358 NW2d 856 (1984); *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992).

In any event, there was overwhelming evidence presented from Dr. Coussens, the independent DNA-procedures expert, and Dr. Conneally, the independent population geneticist (statistical expert). Further, Dr. Howenstein testified that the procedures used by the MSP lab were basically the same procedures described in *Adams, supra*, 195 Mich App 270-273. In fact, the MSP lab undertook a more extensive analysis than the lab in *Adams* (the MSP lab used one more single locus probe, which produced two additional bands for analysis). Defendant failed to show that the DNA testing procedures were unreliable.

(3)

Defendant wrongly argues that the MSP lab's protocol has never been validated by independent scientists and, thus, has not been generally accepted in the

relevant scientific community. Dr. Howenstein testified that the MSP lab's protocol was a slightly modified version of the FBI protocol. She further indicated that every three months the MSP lab and its personnel are subjected to proficiency testing by Cellmark Labs. The MSP lab has passed all ten of the proficiency examinations it has undergone. Barna, the supervisor of the MSP lab DNA unit, testified regarding the validation processes that the MSP lab undergoes.

Defendant argues that Dr. Howenstein and Barna are mere technicians and were unqualified to testify regarding the validation or acceptance of the MSP lab's protocol in the scientific community. In addition to Dr. Howenstein and Barna, however, two impartial, disinterested experts testified concerning the general scientific acceptance of the MSP lab's protocol. Both Drs. Coussens and Conneally testified that the MSP lab followed generally accepted procedures. Dr. Coussens testified that the MSP lab is state of the art, and its quality assurance and proficiency is excellent and well above the norm. In addition, Dr. Conneally testified that the quality of the work that is generated from the MSP lab is excellent—as good as or better than national labs. Both witnesses were competent to testify regarding the acceptance of the MSP lab's protocol in the relevant scientific community. In fact, this Court has previously found that Dr. Coussens was deemed competent to testify as an expert in DNA testing techniques. See *Lee, supra* at 269-270.

Defendant's argument that the MSP lab's protocol is not accepted because it has not been independently validated is also without merit. A party need not show the general acceptance of an already established test. *People v Davis*, 199 Mich App 502, 512;

503 NW2d 457 (1993). Further, independent validation is not necessary where no scientific dispute exists over the testing protocol. *Id.* at 513. The RFLP method of DNA testing has been already established as accepted in the scientific community. *People v Chandler*, 211 Mich App 604, 608, 611; 536 NW2d 799 (1995); *Adams, supra.* Defendant has not established that any scientific dispute exists over the testing protocol utilized in this case.

(4)

Defendant also argues that the statistical evidence was unreliable and inadmissible because it does not pass the *Davis-Frye* test[7], the testimony regarding the statistical evidence did not consider the false positive rate and the rate of laboratory error, and the experts did not present sufficient statistical analysis in support of their conclusion that there was a "match." Again, defendant's claims are without merit.

Defendant argues that the modified ceiling approach is not generally recognized and he questions the reliability of the "product rule," both of which were utilized in the instant case. In *Chandler, supra* at 609-611, however, this Court rejected a similar argument and affirmed that the modified ceiling approach and the product rule method of DNA statistical analysis are generally accepted in the relevant scientific community.

Defendant's argument that the DNA statistical analysis employed here was inadmissible because it could not pass the *Davis-Frye* test is without merit. The

---

[7] *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

statistical evidence need not be subjected to a *Davis-Frye* test. This Court has held that any challenges to the statistical evidence are relevant to the weight of the evidence and not to its admissibility. *Chandler, supra*; *Adams, supra*, 195 Mich App 279.

Defendant incorrectly argues that the testimony regarding the statistical evidence did not consider the false positive rate and the rate of laboratory error. Any discussion of a false positive rate would have been irrelevant because, as concluded by this Court in *Adams, supra*, 195 Mich App 277, "the [RFLP] DNA identification testing cannot result in a 'false positive,' i.e., a false match of the suspect's DNA and the sample from the crime scene. If the laboratory fails to take the proper steps in the procedure, no readable result is visible on the autoradiogram." All the experts testified that in this case the autoradiograms were of excellent quality and were readable. Regarding the rate of laboratory error, Dr. Howenstein specifically testified that there is an error rate of 2½ percent regarding the matching of the DNA band patterns and testified that this was an acceptable range of variation among all the agencies that use the RFLP procedure. This would not affect the admissibility of the evidence, in any event. This Court does not require scientific tests to be infallible, but only that reasonable certainty follow from them. *Lee, supra* at 262; *Adams, supra*, 195 Mich App 276.

Defendant further contends that the experts did not present sufficient statistical analysis in support of their conclusion that there was a "match." We disagree. Each of the experts testified extensively regarding the statistical analysis of the test results. Defendant has failed to show that the DNA identification evi-

dence was unreliable and, thus, has failed to show that he was prejudiced by the lack of a DNA expert at trial.

III

Defendant raises several claims of ineffective assistance of counsel apart from his claims of ineffective assistance regarding the DNA evidence. Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *Pickens, supra* at 302-303; *People v Effinger*, 212 Mich App 67, 69; 536 NW2d 809 (1995). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was below an objective standard of reasonableness under prevailing norms and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Id.* A defendant must also overcome the presumption that the challenged action or inaction was trial strategy. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996).

A

Defendant first contends that defense counsel was ineffective because he failed to contact or use any of defendant's alleged alibi witnesses, thereby depriving defendant of an alibi defense. We agree with the prosecution that defendant's belated claim of an alibi is "incredible." During trial, defendant testified that before trial, he and defense counsel discussed his whereabouts on August 30, 1986, but, despite conferences between himself, his mother, his wife, "et cetera," defendant was unable "to pinpoint exactly where [he was] on that date so that [defense counsel] could give appropriate notice." In his motion for a

new trial filed in December 1994, defendant claimed that his counsel was ineffective for "failing to contact and call alibi witnesses." Yet, defendant did not identify the alleged alibi witnesses. Defendant subsequently submitted two affidavits in support of his claimed alibi defense. The first affidavit was signed by defendant on May 26, 1995, and averred: "I was in Arkansas at the time of this offense. I informed counsel of this and gave him the names of witnesses before trial." Again, defendant did not name the alleged alibi witnesses. The second affidavit, signed May 2, 1995, by defendant's biological father, averred: "[Defendant] was visiting in Arkansas on August 30, 1986. He arrived on August 24, 1986 and left in the middle of September." This affidavit was submitted in the middle of the hearing regarding the motion for a new trial.

Under the circumstances, we will not consider defendant's belated claim of alibi defense. Defendant is not allowed to use affidavits, submitted a year after trial, to contradict his trial testimony. We note that it is inconceivable that in December 1994, defendant could not remember his whereabouts on August 30, 1986 (eight years previous), but a year later, defendant remembered. It is equally unbelievable that in May 1995, defendant recalled telling defense counsel before trial that he was in Arkansas on the day of the offense, when one year earlier, he testified at trial that he had told defense counsel that he could not remember his whereabouts.

B

Defendant also contends that defense counsel was ineffective because he failed to object to the prosecu-

tor's impeaching defendant with evidence of his prior use of marijuana, a prior misdemeanor conviction of shoplifting, and a breaking and entering charge that did not result in a conviction. We disagree. The prosecutor's questions regarding defendant's criminal background and use of controlled substances were in response to defendant's claims on direct examination that he had never been charged with or convicted of a felony and had not been in any trouble since 1986. Once a defendant has placed his character in issue, it is proper for the prosecution to introduce evidence that the defendant's character is not as impeccable as is claimed. *People v Vasher*, 449 Mich 494, 503; 537 NW2d 168 (1995). In addition, because the question of defendant's drug use on the day of the offenses was raised during trial, it was proper for the prosecutor to question defendant regarding his drug use. MRE 611(b).

C

Defendant also argues that defense counsel was ineffective because he failed to object when the prosecutor improperly elicited that he was a Muslim. During the prosecutor's questioning of Eric Schippers, in explaining his familiarity with defendant's home and family, Schippers mentioned that defendant's family members wore "Muslim or a traditional African dress." Schippers testified that defendant never professed that he was of the Muslim faith.

Questioning a witness with regard to the subject of religious beliefs or opinion is forbidden during a criminal proceeding. MRE 610; MCL 600.1436; MSA 27A.1436; *Vasher, supra*; *People v Hall*, 391 Mich 175; 215 NW2d 166 (1974). Likewise, questioning a witness

to explore another individual's religious opinions and beliefs is equally offensive. *People v Bouchee*, 400 Mich 253, 264; 253 NW2d 626 (1977). We find that the prosecutor's questions were arguably improper, but no error requiring reversal occurred in this case because the testimony elicited did not reveal defendant's opinion or belief regarding the subject of religion.[8]

IV

Defendant finally argues that he is entitled to a new trial on the basis that his purported jury waiver was invalid because the trial court failed to establish on the record the voluntary and intelligent nature of the waiver. Specifically, defendant claims that the trial court failed to adequately advise him of the meaning of the right to a jury trial and failed to ascertain whether he was promised anything or threatened. The trial court's determination that a defendant validly waived his right to a jury trial is reviewed for clear error. See *People v James (After Remand)*, 192 Mich App 568, 570; 481 NW2d 715 (1992).

MCR 6.402(B) provides:

> Waiver and Record Requirements. Before accepting a waiver, the court must advise the defendant in open court of the constitutional right to trial by jury. The court must also ascertain, by addressing the defendant personally, that the defendant understands the right and that the defendant voluntarily chooses to give up that right and to be tried by the court. A verbatim record must be made of the waiver proceeding.

---

[8] Although not raised by defendant, we note that defendant was not denied a fair and impartial trial by the prosecutor's line of questions. *People v Legrone*, 205 Mich App 77, 82-83; 517 NW2d 270 (1994).

The record shows that the trial court's questioning of defendant was sufficient. See *People v Shields*, 200 Mich App 554, 560; 504 NW2d 711 (1993), *James (After Remand), supra* (which reversed that part of the prior decision in *People v James*, 184 Mich App 457; 458 NW2d 911 [1990], on which defendant relies), and *People v Reddick*, 187 Mich App 547, 549-550; 468 NW2d 278 (1991). The Court in *James (After Remand), supra* at 570-571, further concluded that a trial court is not required to explain the unanimity required in a jury trial as compared to a bench trial, which is analogous to the argument raised by the instant defendant. Further, defendant does not claim that he was coerced into signing the jury waiver. Neither a remand nor a reversal of defendant's convictions is warranted on this basis.

V

The prosecution argues that any postconviction proceedings on remand should be conducted before a different trial judge because of the trial judge's obvious expressed prejudgment of the case. Because we have concluded that a remand is unnecessary, this issue is moot.[9]

We affirm defendant's convictions and sentences and vacate the trial court's orders granting defendant a new trial and releasing the defendant on bond.

---

[9] If we had ordered a remand in this case, we would conclude that this case should not be assigned to a different judge because disqualification for bias or prejudice is warranted only in the most extreme cases. *Cain v Dep't of Corrections*, 451 Mich 470, 498; 548 NW2d 210 (1996).