# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TROY ANTONIO BROWN,

        Defendant-Appellant.

UNPUBLISHED
October 18, 2018

No. 336058
Macomb Circuit Court
LC No. 2015-002617-FC

Before: O'BRIEN, P.J., and K.F. KELLY and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (penetration involving a victim under 13 years of age), for which he was sentenced to 25 to 60 years' imprisonment. We affirm.

## I. PROSECUTORIAL MISCONDUCT

### A. QUESTIONING CONCERNING RELIGIOUS BELIEFS

On appeal, defendant makes several allegations of misconduct on the part of the prosecution, the majority of which were not preserved for appellate review.[1] As an initial matter, defendant contends that the prosecution committed error requiring reversal by questioning one of the witnesses at trial concerning defendant's religious beliefs. We disagree.

"Generally, a claim of prosecutorial misconduct is a constitutional issue that is reviewed de novo, but a trial court's factual findings are reviewed for clear error." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "Clear error exists where the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Callon*, 256 Mich

---

[1] Aside from an objection to one of the witnesses commenting on the credibility of the victim, the allegations of prosecutorial misconduct were not preserved for appellate review. "[T]o preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

-1-

App 312, 321; 662 NW2d 501 (2003). As a general rule, however, unpreserved claims of prosecutorial error are reviewed under the plain-error standard. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

MCL 600.1436 provides, in pertinent part, "No witness may be questioned in relation to his opinions on religion, either before or after he is sworn." "Const 1963, art 1, § 18 explicitly rejects the common-law requirement that belief in a Supreme Being is a prerequisite to testifying." *People v Bouchee*, 400 Mich 253, 264; 253 NW2d 626 (1977). Likewise, MRE 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." In *People v Jones*, 82 Mich App 510, 516; 267 NW2d 433 (1978), this Court discussed the purpose of MCL 600.1436, explaining that:

> [t]he statute expressly states that questions as to religious opinions are not permissible. The purpose of the statute is to strictly avoid any possibility that jurors will be prejudiced against a certain witness because of personal disagreement with the religious views of that witness. This object recognizes the deep personal feelings many people hold on religion, feelings that may unavoidably conflict with a juror's sworn duty to decide solely on the evidence presented, without injection of personal prejudices.

Hence, "[a] prosecutor may not inquire about the religious beliefs of a witness, or about those beliefs' effect on truthfulness." *People v Dobek*, 274 Mich App 58, 72; 732 NW2d 546 (2007). "Likewise, questioning a witness to explore another individual's religious opinions and beliefs is equally offensive." *People v Leonard*, 224 Mich App 569, 594-595; 569 NW2d 663 (1997), citing *Bouchee*, 400 Mich at 264.

After his arrest in this case, defendant was interrogated by the police. At trial, the two interrogating officers, one of whom was Sergeant Robert Eidt, described defendant's interrogation to the jury at considerable length. While questioning Sergeant Eidt on that subject during direct examination, the prosecution posed the following questions:

> *Q*. All right. Did you ever discuss the topic of religion with [defendant]?
>
> *A*. Yes, I did.
>
> *Q*. What was discussed?
>
> *A*. I asked [defendant] if he believed in God and I asked him what he felt should happen to himself, or how would God view himself after this whole process played out.
>
> *Q*. And what was his response?
>
> *A*. I don't remember exactly word for word.
>
> *Q*. Would your, would the report refresh your recollection as to that?

*A*. Yes, it would.

* * *

*Q*. Okay. Now that your memory is refreshed, what did he say about how he thought God might feel about this?

*A*. He said he didn't know.

On cross-examination, defense counsel also discussed defendant's religious views with Sergeant Eidt:

*Q*. And you brought up religion. Did you discuss judgment day on two different occasions, use that terminology, judgment day?

*A*. Might have.

*Q*. Okay. And when you brought up religion, you brought up God, you brought up hell and heaven and judgment day, [defendant] still never said he did anything wrong, correct?

*A*. Correct.

*Q*. And in fact didn't you tell him that, well, if this little girl's lying then she's going to go to hell, twice did you say that?

*A*. Yes.

*Q*. And that still never triggered any kind of confession or admission from [defendant], correct?

*A*. Correct.

During redirect examination, the prosecution revisited the same subject, asking, "[Defendant] doesn't know how God would feel about it?", and Sergeant Eidt replied, "Correct." In yet another redirect question, the prosecution broached the subject one final time, asking almost the same question and eliciting the same response. Defendant did not object to the line of questioning or request a curative instruction.

In *Dobek*, during direct examination by defense counsel, the defendant, charged with several criminal sexual conduct offenses, shared that his children and wife are Catholic, and that the children attended the Catholic church. *Dobek*, 274 Mich App at 61, 73. During cross-examination, the prosecution inquired of the defendant if he himself was a practicing Catholic, and whether he was a member of the Catholic church in the 1990s, and the defendant answered that he was. *Id*. When the prosecution continued the line of questioning, inquiring of the defendant whether his alleged behavior was consistent with "the tenets of the Catholic faith[,]" defense counsel objected before the defendant answered and the trial court ruled that the prosecution could not proceed with the line of questioning. *Id*. After distinguishing the facts of

*Dobek* from the Michigan Supreme Court's decisions in *People v Hall*, 391 Mich 175; 215 NW2d 166 (1974); *People v Burton*, 401 Mich 415; 258 NW2d 58 (1977) and *Bouchee*, 400 Mich at 253, this Court observed that while the prosecution was apparently acting in good faith where defendant injected the issue of religion into the trial, Michigan caselaw did "not support the road down which the prosecutor was heading." *Dobek*, 274 Mich App at 73-75. However, where the trial court "swiftly and commendably" ceased the impermissible line of questioning, this Court held that the defendant was not denied a fair and impartial trial and that reversal was unnecessary. *Id*. at 75. Notably, this Court recognized that while the prosecution's proposed line of questioning was inappropriate, reversal was not warranted particularly where "the content or substance of [the] defendant's Catholic beliefs was never explored[.]" *Id*. at 75-76.

Similarly, in *Leonard*, the defendant raised a claim of ineffective assistance of counsel, alleging that trial counsel's performance was deficient when he did not object to a line of questioning regarding the defendant being a Muslim. *Leonard*, 224 Mich App at 594. During trial, the prosecution had inquired of a witness about "his familiarity with [the] defendant's home and family" and the witness divulged that the defendant's family "wore 'Muslim or traditional African dress.'" *Id*. The witness testified that the defendant did not in fact "profess that he was of the Muslim faith." *Id*. Recognizing that "[q]uestioning a witness with regard to the subject of religious beliefs or opinion is forbidden during a criminal proceeding[,]" contravening MRE 610 and MCL 600.1436, this Court also observed that "to explore another individual's religious opinions and beliefs is equally offensive." *Id*. at 594-595. While the prosecution's line of questioning in *Leonard* was "arguably improper," the *Leonard* Court concluded that error requiring reversal did not occur "because the testimony elicited did not reveal [the] defendant's opinion or belief regarding the subject of religion." *Id*. at 595. See also *People v Calloway* (*On Remand*), 180 Mich App 295, 297, 298; 446 NW2d 870 (1989) (where a witness at trial answered in the affirmative when asked by the prosecution if she was "a religious person[,]" and also shared that she attended the same church for nine years, the case was factually distinguishable from *Hall* and error requiring reversal did not occur where (1) the prosecution was not inquiring with respect to her "opinions on the subject of religion[,]" and (2) the questions were relevant to the witness's activities at the time of the alleged crime).

The instant case presents facts similar to *Dobek* and *Leonard*, in that the prosecution's questioning of Sergeant Eidt did not lead to the content and substance of defendant's religious beliefs, or his opinions on the subject of religion, being examined and explored in front of the jury. *Dobek*, 274 Mich App at 75-76; *Leonard*, 224 Mich App at 595. The facts of this case are therefore entirely distinguishable from *Hall*, where in that case the prosecution initiated its inquiry into the defendant's religious beliefs by asking if the defendant believed in a "Supreme Being" and continued to insinuate to the jury "that the veracity of [the] defendant's testimony was somehow correlated to the strength and conviction of [the] defendant's beliefs." *Hall*, 391 Mich at 180-181. Put simply, the present facts are not such that it can be said with confidence that defendant's "religious opinions [were] put in front of the judge or jury for their consideration." *Id*. at 182. While the trial court in this case did not intercede when the prosecution pursued the line of questioning defendant now challenges on appeal, the impact is the same as what occurred in *Burton*, as evidence was not adduced concerning the substance of defendant's religious beliefs and opinions, and consequently there is no "prejudicial impact" arising from the prosecution's questioning of Sergeant Eidt. *Burton*, 401 Mich at 418. Where the present circumstances certainly do not present a scenario where "the nature, substance and

-4-

content of [defendant's] religious beliefs" were canvassed before the jury, *Bouchee*, 400 Mich at 262, we are not persuaded that any error, particularly error necessitating reversal, occurred.[2]

## B. STATEMENT ABOUT THE "TRUTH" BEING SOMEWHERE IN THE MIDDLE

Defendant also contends that the prosecution committed intentional misconduct by using Sergeant Eidt's false testimony to secure defendant's conviction and by failing to correct that false testimony. We disagree.

As the Michigan Supreme Court explained in *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015):

> It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected. It is well established that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction[.] Indeed, the prosecution has an affirmative duty to correct false testimony . . . . The responsibility does not cease to apply merely because the false testimony goes only to the credibility of the witness. Nor is the blameworthiness of the prosecutor relevant. Rather, while not every contradiction is material and the prosecutor need not correct every instance of mistaken or inaccurate testimony, it is the effect of a prosecutor's failure to correct false testimony that is the crucial inquiry for due process purposes. [Quotations marks and citations omitted.]

Even accepting defendant's contention that it should have been obvious to the prosecution that Sergeant Eidt's testimony on direct examination had been inaccurate or substantially misleading, we are not persuaded that reversal is necessary. Reversal is only warranted if "there is a reasonable likelihood that the false impression resulting from the prosecutor's exploitation of the testimony affected the judgment of the jury." *Smith*, 498 Mich at 483. On this record, we are not persuaded that Sergeant Eidt's testimony affected the judgment of the jury, primarily where Eidt himself candidly admitted during cross-examination that his testimony might have been incorrect. Moreover, having reviewed the video itself, it is apparent that defendant made a non-verbal response to the challenged statement about the truth being somewhere in the middle, nodding his head in a discernable affirmative reply. Thus, even if that particular portion of the video would have been shown to the jury to correct Sergeant Eidt's testimony, or assuming that Sergeant Eidt had instead been permitted to refresh his recollection by watching the video, the jury would have learned that although defendant did not orally state that the truth was somewhere in the middle, he did indeed nod in assent when it was said. Under such circumstances, we are not persuaded that any alleged error on the part of the prosecution affected the judgment of the jury. *Smith*, 498 Mich at 483.

---

[2] Given our disposition of this issue, we need not reach the question whether *Hall* mandates automatic reversal in this case. See, e.g, *Nashal v Freemont Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket Nos. 336234; 336919); slip op at 9-10.

## C. EVIDENTIARY ISSUES

Defendant next contends that the prosecution committed error requiring reversal by questioning Heather Solomon on direct examination about whether her interview with the victim was "consistent with the allegations" against defendant or the "alternative hypothesis" that the victim was "attention seeking" or had possibly identified the incorrect suspect. At the most fundamental level, however, that argument is fatally flawed. "A finding of prosecutorial misconduct may not be based on a prosecutor's good-faith effort to admit evidence." *Dobek*, 274 Mich App at 75. And as a matter of law, the prosecution cannot be found to have acted in bad faith by introducing evidence that the trial court ruled admissible. See *id*. at 80 ("While there may be issues regarding whether this was improper other-acts evidence, we cannot conclude that the prosecutor proceeded in bad faith, given that the trial court permitted the questioning and testimony.").

Next, defendant challenges the prosecution's decision to elicit testimony regarding defendant's status of being unemployed. On direct examination, defendant's girlfriend/fiancée, Ashley Merriweather, testified that defendant was "a great father" to their two children. The prosecution sought to rebut such testimony on cross-examination, contrasting the victim's older brother with the jobless defendant and asking Merriweather whether she had previously expressed her dissatisfaction with defendant "because he didn't do anything, work wise[.]" Defendant objected on grounds of relevance, and the trial court decided that the testimony was "marginally relevant," holding that it would permit a "limited inquiry into this area." Again, as a matter of law, the prosecution cannot be said to have acted in bad faith by introducing evidence that the trial court expressly ruled admissible. See *id*. Therefore, defendant's instant claim of prosecutorial error warrants no relief.

Defendant also argues that the prosecution committed misconduct where it adduced evidence regarding the belief of the police officers that questioned defendant concerning whether defendant was telling the truth. On direct examination, the prosecution elicited testimony that both Detective Twardesky and Sergeant Eidt believed, for a variety of reasons, that defendant had been untruthful with them during his interrogation. The first time that the prosecution did so, the defense objected, arguing that the prosecution was attempting to classify Detective Twardesky "as an expert in classifying who's a sex offender and who isn't." The prosecution responded by arguing that the question was relevant to explain Twardesky's "state of mind" and why he continued the interrogation despite defendant's denials. The trial court held that the response would be admitted for that purpose but was inadmissible "as to ultimate opinion[.]" Defense counsel did not renew the objection when Sergeant Eidt subsequently offered similar testimony on direct examination. Defendant posits that the prosecution committed error requiring reversal by introducing such opinion testimony about defendant's truthfulness during his interrogation. Once again, because the trial court held that such evidence was admissible for the limited purpose of showing why the police decided to continue the interrogation, the prosecution cannot be held to have acted in bad faith by admitting it. See *id*.

In his Standard 4 brief, defendant contends that the prosecution committed error requiring reversal by introducing false testimony from Detective John Newman, in which he mischaracterized one of defendant's jailhouse telephone calls with Merriweather, suggesting that defendant tacitly admitted that he had sexually abused the victim. Defendant contends that the

prosecution knowingly capitalized on such false testimony to secure a conviction. For several reasons, we are unpersuaded. First, defendant has not shown that Detective Newman's challenged testimony was either false or materially misleading. Detective Newman offered an *opinion* concerning what he believed to be the subtext of the jailhouse calls. After reviewing the two conversations in question, we discern no basis to conclude that Detective Newman's testimony was false. On the contrary, his opinion about the subtext of the conversations is plausible, particularly in light of (1) the fact that the jail's automated system warns the call's participants that it is subject to monitoring, and (2) Detective Newman's observation that in roughly 50 recorded telephone calls between defendant and Merriweather, defendant never once *denied* having sexually assaulted the victim. In the conversation at issue here, defendant states that he was "in here," i.e., jail, because he had "made mistakes" and "done so much dumb s**t."[3] Moreover, it is altogether reasonable to assume that prisoners, who are aware that their phone calls are being recorded, may speak about inculpatory events in a veiled, intentionally obscure manner. The fact that defendant disagrees with Detective Newman's opinion concerning the subtext of the jailhouse telephone calls does not serve as proof that that opinion was disingenuous.

Second, even assuming that Detective Newman *did* intentionally mischaracterize defendant's conversation with Merriweather, defendant has failed to demonstrate that the prosecution was aware of that fact or that it should have been obvious. Finally, on direct examination, defendant explained his version of what the jailhouse calls were about, as did Merriweather. Both claimed that the conversation had nothing to do with the victim and instead regarded one of Santana Rowland's friends, with whom defendant had been unfaithful to Merriweather. Under such circumstances, defendant has failed to demonstrate that Detective Newman's testimony about the jailhouse telephone calls might have seriously affected the fairness of the trial.

## D. VOUCHING FOR THE VICTIM'S CREDIBILITY

At closing, the prosecution argued at considerable length that the jury should credit the victim's testimony while rejecting defendant's testimony. Defendant asserts that such argument constituted improper vouching for the victim's credibility. We disagree.

It is true that, as a general rule, the prosecution is prohibited from vouching for a witness's credibility by suggesting that the prosecutor "has some special knowledge" regarding that witness's truthfulness. *People v Jackson*, 313 Mich App 409, 426; 884 NW2d 297 (2015) (quotation marks and citation omitted). However, "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004).

---

[3] Defendant and Merriweather testified that those references to "mistakes" and "dumb s**t" referred to an affair defendant had had with another woman.

In this case, in which the credibility of the victim and defendant were of paramount importance, the prosecution's comments about the victim's credibility were not plainly erroneous. Rather, viewed in context, those comments were properly based on reasonable inferences from record evidence, and they did not suggest that the prosecutor had any "special knowledge"—i.e., any knowledge gleaned from sources other than what had been presented to the jury at trial—that the victim had testified truthfully.

## E. APPEALING TO THE SYMPATHY OF THE JURY

Defendant next argues that the prosecution committed error requiring reversal by appealing to the jury's sympathy for the victim during closing arguments. We are unpersuaded. During opening statements, it was defense counsel—not the prosecution—who first mentioned that the victim had "had a tough childhood," "a tough go," and that the jury might well be inclined to "feel sorry for her[.]" Thus, defendant's instant claim of error should be rejected. Defendant cannot contribute to an alleged error at trial, and then assert it a ground for reversal on appeal. See *People v Jordan*, 275 Mich App 659, 666; 739 NW2d 706 (2007). See also *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010) (noting that it is axiomatic that "a party may not harbor error at trial and then use that error as an appellate parachute"). In other words, the defense should not be permitted to explicitly note that the victim *is* sympathetic during opening statements, then complain on appeal that the prosecution erred by echoing that same sentiment.

In any event, even if the prosecution's remarks concerning sympathetic characteristics of the victim were improper, they do not entitle defendant to reversal here because he has failed to demonstrate any prejudice resulting from those comments. The trial court properly instructed the jury that its verdict could be based only on the "the evidence that ha[d] been properly admitted," further instructing them that the attorneys' "statements and arguments . . . are not evidence." "Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Defendant has not offered any evidence to overcome that presumption in this instance; indeed, he does not even argue the point. Hence, he has failed to carry his burden of persuasion under the plain-error test, and he is unentitled to appellate relief.

## F. ASKING WITNESSES TO COMMENT ON THE CREDIBILITY OF OTHER WITNESSES

Defendant asserts that he is entitled to reversal because the prosecution erred by asking both defendant and Merriweather to comment on the credibility of several prosecution witnesses, including the victim. Even accepting defendant's contention that this was improper, if the jury is instructed that it alone is charged with determining the facts of the case, including which witness's testimony to believe, the defendant cannot prevail on such a claim of error under plain-error review. *People v Gaines*, 306 Mich App 289, 308; 856 NW2d 222 (2014). In this case, the jury received essentially the same instructions as did the jury in *Gaines*; to wit, it was instructed that the jurors were "the only judges of the facts" and were obliged to "decide which witnesses [they] believe[d] and how important . . . their testimony [wa]s." Therefore, as in *Gaines*, here "defendant cannot establish that the prosecutor's questions affected his substantial rights." See *id*.

## G.  IMPEACHMENT OF DEFENDANT

On direct examination, when asked why he agreed to meet the victim's brother at the hospital, defendant replied: "Because I wanted to, you know, give them my DNA or whatever the situation, I wanted to, like I say clear myself from the allegations.  You know, I never been charged with nothing like this before, ever been in trouble for assault, a criminal, nothing like that."  On cross-examination, the following exchange ensued:

*Q*.  Okay.  You also said that you've never been accused of any sort of assault.

*A*.  No sexual assault.

*Q*.  You used the word assault, sir.  And so I'm looking at your criminal history and in 2009 you in fact were charged with assault with intent to do great bodily harm less than murder, weren't you?

*A*.  Yes.

*Q*.  Okay.  And you were charged with aggravated domestic violence, correct?

*A*.  Yes.

*Q*.  And assault with a dangerous weapon, correct?

*A*.  Yes.

*Q*.  And that assault with a dangerous weapon involved a plea under the Holmes Youthful Trainee Act?

*A*.  Yes.

*Q*.  Right, that's an admission of guilt?

*A*.  Yes.

*Q*.  Okay.  Did your incident in 2013 involve an assault?

*A*.  What was it in '13, what happened in 2013?

[*Defense Counsel*]:  Your honor, can we approach?

A bench conference was subsequently held off of the record, and when defendant's testimony resumed, the prosecution ceased questioning defendant regarding his prior criminal history.  Defendant contends that such questioning constituted improper "impeachment" with former convictions and charges.  While the disputed evidence would likely not have been admissible as general impeachment evidence had the prosecution sought to broach the subject of defendant's criminal history *before* he broached it on his own, because that is not what

happened, the point is moot. "That our Rules of Evidence preclude the use of evidence for one purpose simply does not render the evidence inadmissible for other purposes. Rather, the evidence *is* admissible for a *proper* purpose, subject to a limiting instruction under MRE 105." *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000) (emphasis added).[4] When a defendant "takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue." *People v Clary*, 494 Mich 260, 267; 833 NW2d 308 (2013), quoting *Raffel v United States*, 271 US 494, 497; 46 S Ct 566; 70 L Ed 1054 (1926). In pertinent part, MRE 404(a) provides:

> Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> (1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same . . . .

"Once a defendant has placed his character in issue, it is proper for the prosecution to introduce evidence that the defendant's character is not as impeccable as is claimed." *People v Vasher*, 449 Mich 494, 503; 537 NW2d 168 (1995). "Such *rebuttal* testimony is admissible under MRE 404(a)(1)." *Id*. (emphasis added). See also *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996) ("Rebuttal evidence is admissible to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same.") (quotation marks and citation omitted).

In this case, on direct examination defendant testified—falsely, he later conceded—that he had never been "in trouble" for "assault," further suggesting that he had never been in *any* sort of "criminal" trouble before. The fact that defendant backpedaled from such testimony on cross-examination, explaining that he had meant to testify that he had never been charged with *sexual* assault before, did not make it improper for the prosecution to walk through the evidentiary door that defendant had, of his own volition, swung ajar. Rather, after defendant suggested that he had no prior criminal charges, it was altogether appropriate for the prosecution to cross-examine him on that subject for rebuttal purposes. See *id*. Because such evidence was admissible for rebuttal purposes, the prosecution did not err by introducing it. In sum, defendant's allegations of prosecutorial misconduct are without merit.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant raises several allegations of ineffective assistance of counsel, none of which have merit.

---

[4] In this instance, because defendant made no request for such a limiting instruction, he cannot assign the trial court's failure to give one as error requiring reversal. See *People v Sardy*, 216 Mich App 111, 113; 549 NW2d 23 (1996).

-10-

In this case, a *Ginther*[5] hearing occurred, and thus this Court's review includes the evidence presented at the *Ginther* hearing. See, e.g., *People v Trakhtenberg*, 493 Mich 38, 45-46; 826 NW2d 136 (2012). "[W]hether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *Id*. at 47. The "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [*People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012) (citations omitted).]

This Court will not "second-guess" trial counsel's strategy with "the benefit of hindsight." *People v Foster*, 319 Mich App 365, 391; 901 NW2d 127 (2017). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *Unger*, 278 Mich App at 242. Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for that of counsel on matters of trial strategy[.]" *Id.* at 242-243. "The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). Accordingly, the reviewing court must consider the full range of potential reasons that counsel might have had for acting as he or she did. *Id*.

## A. VIDEO OF DEFENDANT'S INTERROGATION

Defendant first argues that his trial counsel performed ineffectively by failing to "formally" move for the admission of the video of defendant's interrogation or, in the alternative, to have the trial judge view the video in camera to prove that Sergeant Eidt testified falsely when he claimed that defendant had said that the truth was somewhere in the middle. Defendant has failed to rebut the presumptions that counsel's performance in this regard was both strategic and effective.

"The decision of what evidence to present is . . . presumed to be a matter of trial strategy." *People v Solloway*, 316 Mich App 174, 190; 891 NW2d 255 (2016). At the *Ginther* hearing, defense counsel testified that—despite his stated *threats* to introduce the interrogation video into evidence—for "a lot of reasons," he had no genuine desire to do so. In particular, counsel agreed that defendant's "non-verbals [during the interrogation] were very damaging[.]"

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

In our estimation, counsel was correct. The video portrays defendant making a non-verbal response to the statement about the truth being somewhere in the middle, nodding his head in an affirmative reply. And even assuming that only *that* portion of the video would have been shown to the jury to correct Sergeant Eidt's testimony, or assuming that Sergeant Eidt had been permitted to refresh his recollection by watching the video, nevertheless, the jury likely would have learned that although defendant did not orally *state* that the truth was somewhere in the middle, he nodded in assent.

Moreover, trial counsel explained at the *Ginther* hearing that he was concerned that, had he moved to admit only the "snippet" of the video that was necessary to correct Sergeant Eidt's testimony, the prosecution might have successfully moved to introduce the *entire* video. This was a valid concern. See MRE 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). Having the trial court view the video in camera posed similar risks. The trial court might have decided that the only way to duly correct Sergeant Eidt's testimony was to introduce the entire video into evidence. And while counsel might have successfully argued that certain portions of the video were inadmissible on various grounds, he would have had no guarantees before moving to introduce the video about which portions the trial court might have permitted the jury to view.

Having reviewed the video of defendant's interrogation, we conclude that the introduction of the entire video—or nearly any portion of it—would have been prejudicial to the defense. Put simply, although defendant never clearly admits guilt, his demeanor and body language are, throughout the interrogation, completely inconsistent with what an average juror would likely expect of an innocent man accused of sexually assaulting an 11-year-old girl. Defendant does not rage, make strong or complete denials, appear indignant or offended, or express disbelief. Nor does he express sympathy or concern for the young victim, suggest that someone else might be responsible, or offer any sort of alibi or explanation. He consistently appears defeated and defensive, at times sighing loudly, weeping, and placing his head on the table. Toward the end, he begins to make comments tending to suggest that he has already concluded that he will be convicted of whatever charges might be brought against him.

Additionally, during the interrogation defendant admits to (1) smoking marijuana ("two blunts") earlier that day, (2) evading income tax by working under the table, which suggests that he may have had employment of which Merriweather was unaware, and (3) a former conviction for home invasion, which was never mentioned at trial. Even with his marijuana use in mind, defendant appears to be inordinately confused regarding basic details about the preceding day, i.e., the day of the assault, such as whether he had gone to work or showered. At times, he takes uncomfortably long pauses before responding to questions about such seemingly trivial details, appearing torn about how to answer. The footage of his excited reply that "it never got that far," made in response to an officer's comment that the victim's vaginal secretions might be found in defendant's pubic hair, seems far more damaging than the testimony on that point that was introduced at trial. And toward the end of the interview, he begins to ask the officers whether they believe that he needs an attorney. For those reasons, it was entirely reasonable for trial counsel to believe that it was imprudent to seek to correct Sergeant Eidt's testimony by having any portion of the video introduced into evidence. The risk of having almost any other portion of

that video admitted under MRE 106 was untenable. It was a reasonable strategy for counsel to instead impeach Sergeant Eidt on cross-examination—forcing him to admit that he could not recall who made the disputed statement and that he thus might have been incorrect on direct examination—while also preventing the prosecution from later rehabilitating Sergeant Eidt on that point.

### B. FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT

Defendant next contends that his trial counsel performed ineffectively by failing to object to the alleged instances of prosecutorial error discussed earlier in this opinion and to argue that the cumulative effect of such errors had denied defendant of his right to a fair trial. For three primary reasons, this claim of error is without merit.

First, defendant's trial counsel did, in fact, object to many of the alleged instances of prosecutorial misconduct, at times successfully. It should go without saying that, to the extent that defense counsel objected *successfully* to the prosecution's tactics, his performance cannot be deemed ineffective. Moreover, the fact that his other objections were unsuccessful is not evidence that his performance fell below an objective standard of reasonableness under prevailing professional norms. On the contrary, because the trial court overruled those objections, they were futile and cannot serve as a basis to conclude that defense counsel performed ineffectively. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Second, as discussed earlier in this opinion, defendant's claims of prosecutorial misconduct fail on their substantive merits. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Id*. Finally, defendant cannot rebut the strong presumptions that counsel's failure to object was effective and strategic.

### C. STIPULATION TO THE ADMISSION OF EVIDENCE

In his Standard 4 brief, defendant argues that trial counsel performed ineffectively by stipulating to the introduction of the recordings of his jailhouse telephone calls. Defendant contends that the jailhouse telephone calls were inadmissible for lack of relevance under MRE 401[6] and because any probative value was significantly outweighed by the attendant risk of unfair prejudice under MRE 403.[7]

To the extent that they contained out-of-court statements made by defendant, the recordings could have been admitted by the prosecution over defendant's objection as

---

[6] MRE 401 provides, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[7] MRE 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

admissions by a party opponent, see MRE 801(d)(2), and Merriweather's comments were likely admissible for the non-hearsay purpose of providing context to defendant's statements and responses during the conversation (i.e., for that purpose only and not to prove the truth of the matter in any assertions that Merriweather might have made). We note that defendant is correct that admissions by a party opponent may be excluded under MRE 401 and MRE 403. *People v Goddard*, 429 Mich 505, 515 & n 9; 418 NW2d 881 (1988).

However, defendant has failed to show a reasonable probability of a different outcome but for counsel's failure to object. On direct examination, defendant explained his version of what the jailhouse calls were about, as did Merriweather. Both claimed that the conversation had nothing to do with the victim and instead regarded one of Rowland's friends, with whom defendant had been unfaithful to Merriweather. Accordingly, defendant was well able to counter the prosecution's theory that the jailhouse calls reflected defendant's culpability in the sexual assault of the victim and his guilty conscience. As a result, even assuming that defense counsel should have objected to the introduction of the recordings, defendant has not shown a reasonable probability that, but for counsel's failure to make such an objection, the outcome of the proceedings would have been different.

Affirmed.


/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood