*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW JOHN-LAWRENCE LAFEY,

Defendant-Appellant.

FOR PUBLICATION
September 27, 2024
9:54 AM

No. 361936
Barry Circuit Court
LC No. 2021-000764-FC

Before: GARRETT, P.J., and RIORDAN and LETICA, JJ.

RIORDAN, J.

Defendant, Andrew John-Lawrence Lafey, appeals as of right his bench-trial convictions and sentences for first-degree murder, MCL 750.316; torture, MCL 750.85; felon in possession of a firearm (felon-in-possession), MCL 750.224f; and three counts of carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to life in prison without parole for the first-degree murder conviction and 25 to 80 years' imprisonment for the torture and felon-in-possession convictions. Additionally, the trial court sentenced defendant to two-year terms of imprisonment for each felony-firearm conviction to be served concurrent with each other, but consecutive to the underlying offenses. The trial court also imposed the condition that defendant not be allowed any future contact with the outside world, other than with his attorney.

On appeal, defendant contends that the trial court erred by accepting his election of a bench trial without proper waiver of his right to a jury trial and erred by admitting his inculpatory statement made without a *Miranda* warning.[1] Further, defendant contends that the trial court's imposition of a condition of sentence prohibiting him from having contact with individuals outside prison except for legal counsel is invalid. We affirm defendant's convictions, but remand to the trial court for removal of the no-contact condition from his sentence.

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-1-

# I. FACTS

This appeal stems from the torture and murder of defendant's girlfriend, G.B. In the weeks leading up to G.B.'s death, defendant told several witnesses that he would kill her because she gave him a sexually transmitted disease. Likewise, on the day of her murder, defendant again stated that he would kill her. That day, witnesses saw defendant leave his house with G.B. He was carrying a .22 caliber rifle. When defendant returned later that evening, he was alone. He proceeded to show his roommates a video that he filmed of himself stomping on G.B. and berating her. The video was approximately 12 minutes long and showed defendant violently stomping on G.B. approximately 50 times. That same night, defendant called his father, Joseph Ketola, telling him that he killed someone by shooting her twice and that he needed help hiding the body. The day after the murder, the owner of defendant's house and one of the witnesses to whom defendant showed the video, Charles James, went to defendant's father, Ketola, and discussed the murder. Together, Ketola and James went to the police to report the murder the next day.

After receiving the tip from Ketola and James, Nashville Police Chief Christopher Sean Underhile and Barry County Sheriff's Department Sergeant Richard Frazer and Deputy Kevin Erb went to James's house to question defendant. Chief Underhile wore a body camera during this interaction. During their questioning of defendant, defendant handed his phone to Deputy Erb, who found a picture of G.B.'s body in the camera gallery. After detaining defendant, Sergeant Frazer performed a pat-down search of him. During that pat-down, defendant motioned to his pocket and stated, "In the small pocket are the shells I shot her with." These shell casings were forensically linked to a .22 caliber rifle found at James's house. The same day, the officers found G.B.'s body buried in the snow on James's property.

After defendant was arrested, he participated in an interview in which he stated that he made the video of himself stomping on G.B. Further, after defendant was incarcerated, he made the statement, "I will kill you bitches just like I killed the other bitch" to a corrections officer during a move from a lower security cell to a higher security cell.

Before trial, defendant moved to suppress the statements that he made and which were recorded on Chief Underhile's body camera video which he spoke before he was advised of his *Miranda* rights. The trial court suppressed most of the statements on the video leading up to the provision of defendant's *Miranda* rights, except for the statement regarding the shell casings. In allowing this statement, the trial court reasoned that the statement was made spontaneously and not in response to any interrogation.

Defendant was convicted and sentenced as stated earlier. He now appeals.

## II. WAIVER OF JURY TRIAL

First, defendant contends that he is entitled to a new trial on the basis that his waiver of his right to a jury trial was constitutionally invalid. We disagree.

Before trial, defendant demanded a jury trial. During jury selection, however, defendant changed his mind and requested to proceed with a bench trial. After several potential jurors were excused for cause, defense counsel approached the trial court for a bench conference. After returning from the bench conference, the trial court indicated that defendant told his attorneys that

he changed his mind about having a jury trial and, instead, wanted to proceed with a bench trial. Before granting defendant's waiver of a jury trial, the trial court engaged in a colloquy with defendant:

>*The Court*:  [Defendant], it's my understanding that you would like to do a Bench Trial where I will be the finder instead of a jury; is that correct?

>*The Defendant*:  Yes, your Honor.

>*The Court*:  And you have discussed this—you have two very good attorneys by the way, and you've discussed this with them?

>*The Defendant*:  Yes, your Honor.

>                         *  *  *

>*The Court*:  You've discussed this with your attorneys?

>*The Defendant*:  Yes, sir.

>*The Court*:  You don't feel like you're being pressured or anything like that—

>*The Defendant*:  No.

>*The Court*:  —to make this decision.

>*The Defendant*:  I'm the one who brought it up.

>*The Court*: Okay.  Okay.  [Defense attorneys], any questions you [sic] like to ask [defendant]?

Afterward, both defense attorneys questioned defendant regarding this decision.  First, Attorney James Kinney questioned defendant:

>*Mr. Kinney*:  [Defendant], you have in front of you a copy of the amended Information that I've given you, correct?

>*The Defendant*:  Yes.

>*Mr. Kinney*:  And these detail the charges against you, correct?

>*The Defendant*:  Yeah.

>*Mr. Kinney*:  Okay.  In addition to which this waiver of a jury has to be in open court, and it is in open court because your mother is right behind you, correct?

>*The Defendant*:  Yes.

-3-

*   *   *

*Mr. Kinney*:  And you're the one who brought this up, that you wanted the Judge to make the decision as to acquittal or guilt, correct?

*The Defendant*:  Yes, your Honor.  Or yes—

*   *   *

*Mr. Kinney*:  . . .  Anyway, you are voluntarily waiving your right to a Jury Trial?

*The Defendant*:  Yes.

*Mr. Kinney*:  And you and [both defense attorneys] discussed both the advantages of a Jury Trial and the advantages or disadvantages of both, also of a Bench Trial, correct?

*The Defendant*:  Yes.

*Mr. Kinney*:  Can you explain your reasons as to why you want a Bench Trial instead of a Jury?

*The Defendant*:  Well, I feel it's better because I don't feel I can handle goin' through the whole jury thing, and I feel that it'll—the Jury, soon as they see the video they're gonna find me guilty either way, so—and I feel like it's not just gonna be easier for me but it'll be easier for the court so.

After defendant affirmed that he was not under the influence of alcohol or any mind-altering substances, defendant's second attorney, Jackie Baker, asked defendant several questions regarding his waiver of his right to a jury trial:

*Ms. Baker*:  Do you think you've had enough time with [us] to discuss this before you made this decision?

*The Defendant*:  Yeah.

*Ms. Baker*:  And this decision came up because you had passed a note along to—to Jim; is that right on that?

*The Defendant*:  Yup.

*Ms. Baker*:  And you're confident that you understand the benefits and the deterrents to both the Jury Trial and a Bench Trial?

*The Defendant*:  Yup.

-4-

> *Ms. Baker*:  And you know that this process—I know right before we went on the record you had a question about this process—that alls you're doing at this point is waiving the Jury Trial, that after this time when we're in this room, we're gonna go into the bigger courtroom you just left from, and Judge Schipper will be making the decisions; you understand that?
>
> *The Defendant*:  Yup.
>
> *Ms. Baker*:  And that's what you'd like to happen?
>
> *The Defendant*:  Yes.

After defendant's attorneys concluded their questioning, the trial court granted defendant's request for a bench trial.  The trial court noted that after speaking with defendant for several minutes, it could see that defendant was comfortable with his decision, defendant was not stressed or pressured to make the decision, and that defendant clearly made the decision.  The trial court further noted that defendant's decision was "thoughtful on his part . . . ."

Generally, a trial court's determination that a defendant validly waived his constitutional right to a jury trial is reviewed for clear error.  *People v Leonard*, 224 Mich App 569; 595; 569 NW2d 663 (1997).  However, because defendant failed to preserve this constitutional issue for appeal, we review it for plain error affecting substantial rights.  See *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015).  We may grant relief if defendant meets the four-part *Carines*[2] test.  *Id*.  Defendant must establish "that (1) an error occurred, (2) the error was 'plain'—clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected."  *Id.*  If defendant satisfies the first three prongs, we must exercise our discretion in deciding whether to reverse, and "relief is warranted only when the court determines that the plain, forfeited error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of the judicial proceedings."  *Id*. (cleaned up).

"The adequacy of a jury trial waiver is a mixed question of fact and law."  *People v Cook*, 285 Mich App 420, 422; 776 NW2d 164 (2009).  Our review of the interpretation of court rules is de novo.  *People v Kimble*, 470 Mich 305, 308-309; 684 NW2d 669 (2004).

Under both the United States and Michigan Constitutions, "[a] criminal defendant has a constitutionally guaranteed right to a jury determination that he is guilty beyond a reasonable doubt."  *Cook*, 285 Mich App at 422, citing US Const, Am VI; Const 1963, art 1, § 20.  "However, with the consent of the prosecutor and the approval of the trial court, a defendant may waive his right to a jury trial."  *Cook*, 285 Mich App at 422.  To validly waive the right to a jury trial, that waiver "must be both knowingly and voluntarily made."  *Id*.  MCR 6.402 provides in full:

---

[2] *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

(A) Time of Waiver. The court may not accept a waiver of trial by jury until after the defendant has been arraigned or has waived an arraignment on the information, or, in a court where arraignment on the information has been eliminated under MCR 6.113(E), after the defendant has otherwise been provided with a copy of the information, and has been offered an opportunity to consult with a lawyer.

(B) Waiver and Record Requirements. Before accepting a waiver, the court must advise the defendant in open court of the constitutional right to trial by jury. The court must also ascertain, by addressing the defendant personally, that the defendant understands the right and that the defendant voluntarily chooses to give up that right and to be tried by the court. A verbatim record must be made of the waiver proceeding.

Before the adoption of MCR 6.402, a waiver of the right to a jury trial was required to be in writing pursuant to MCL 763.3(1). However, the adoption of MCR 6.402 superseded the statute's writing requirement. *People v Reddick*, 187 Mich App 547, 548-549; 468 NW2d 278 (1991), citing MCR 6.402 (staff comment).

Complying with the requirements of MCR 6.402(B) "creates a presumption that a defendant's waiver was voluntary, knowing, and intelligent." *People v Mosly*, 259 Mich App 90, 96; 672 NW2d 897 (2003). The procedures set forth in this court rule are not a constitutional mandate. Citing federal authority, this Court has explained that "a trial court's failure to follow procedural rules for securing a waiver of the right to a jury trial does not violate the federal constitution nor does it require automatic reversal." *Id.* "If a defendant's waiver was otherwise knowingly, voluntarily, and intelligently made, reversal will not be predicated on a waiver that is invalid under the court rules . . . because courts will disregard errors that do not affect the substantial rights of a defendant." *Id.* "[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *Adams v United States ex rel McCann*, 317 US 269, 278; 63 S Ct 236; 87 L Ed 268 (1942). "[T]he dispositive inquiry is whether the defendant understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *Jells v Mitchell*, 538 F3d 478, 510 (CA 6, 2008) (quotation marks and citation omitted).[3] When these requirements are not met, "constitutionally invalid jury waiver is a structural error that requires reversal." *Cook*, 285 Mich App at 427.

In this case, the trial court arguably did not strictly comply with the requirements of MCR 6.402 but, in any event, the purported error did not give rise to a constitutionally invalid waiver. Certainly, the trial court complied with the requirements that the waiver was conducted in an open courtroom, that a record was produced of the waiver, and that the trial court engaged in an exchange to ascertain whether the defendant's waiver was knowing and voluntary. See MCR

---

[3] Federal caselaw is not binding precedent, but it can be persuasive. See *People v Gillam*, 479 Mich 253, 261; 734 NW2d 585 (2007).

6.402(B). The trial court personally engaged with defendant and asked whether he felt pressured to waive this right. However, the record does not indicate that the trial court informed defendant that he had a "constitutional" right to a jury trial, although the trial court repeatedly informed defendant that he had a right to a jury trial.[4] In other words, that while the trial court did not inform defendant that the right to a jury trial is constitutional in nature it, nonetheless, told defendant several times of his right to a jury trial. Arguably, the failure to specify that the right to a jury trial is constitutional in nature resulted in a failure to strictly comply with the requirements of MCR 6.402(B), as the court rule provides that "the court must advise the defendant in open court of the *constitutional* right to trial by jury." (Emphasis added.) However, this does not amount to plain error nor a structural error warranting a reversal.

Assuming that the trial court did not comply with the requirements of MCR 6.402 in its colloquy with defendant because it did not inform defendant that his right to a jury trial is constitutional in nature, this fact alone does not rise to error requiring reversal. See *Mosly*, 259 Mich App at 96.[5] If defendant waived his right to a jury trial knowingly, voluntarily, and intelligently, the allegedly inadequate colloquy under the court rule did not affect his waiver. See *id*.

The record supports that defendant knowingly, voluntarily, and intelligently waived his right to a jury trial. Questioning by the trial court and both of defendant's attorneys showed that defendant consulted with his attorneys about this issue and that he understood that he was waiving his right to a jury trial. The context of defendant's waiver was that, before trial, defendant demanded a jury trial; however, in the middle of jury selection at trial, defendant prompted one of

---

[4] Indeed, it was during the middle of voir dire for his jury trial that defendant instructed his counsel to request a bench trial.

[5] Defendant contends that reversal is warranted because "there is no reference whatsoever to the 'constitutional' right to a jury trial at any time during the jury waiver." However, we note that "colloquies are not constitutionally required and that an extremely perfunctory waiver with no colloquy [may be] constitutionally adequate." *Sowell v Bradshaw*, 372 F3d 821, 834 (CA 6, 2004). Moreover, the defendant merely must be made aware of the "rudimentary elements of trial by jury." See *Spytma v Howes*, 313 F3d 363, 371 (CA 6, 2002) ("While the trial court failed to conduct an on-the-record colloquy, such a colloquy is not required and the record does not disclose any evidence that petitioner was so unaware of the rudimentary elements of trial by jury that his waiver cannot stand."). Thus, the failure of the trial court in this case to specify that the right to a jury trial is constitutional in nature—as opposed to, perhaps, a statutory or court-rule basis—does not strike us as automatically warranting reversal under the federal or state constitution. Further, we note that the general rule in federal courts is that "it would be advisable for federal district courts to engage in a colloquy with the defendant about the function of a jury and the difference between a bench and jury trial." *Pierre v Leger*, 495 Fed App'x 403, 410 (CA 5, 2012). In other words, the fundamental question here is whether defendant was aware of how jury and bench trials operate, not whether defendant was aware of the underlying sources of authority for those trials. Here, the record shows that defendant was made aware of how jury and bench trials operate, as the trial court explained that the ultimate finder of fact in a jury trial is the jury, whereas the ultimate finder of fact in a bench trial is the judge.

his attorneys to request a bench trial. The trial court first asked defendant if he "would like to do a [b]ench [t]rial where [the trial court] will be the finder instead of a jury" and affirmed that defendant did not feel pressured to choose a bench trial. Afterward, defendant was questioned by both of his attorneys, who affirmed that defendant was the one who brought up pursuing a bench trial, that he wanted the judge to make the decision of acquittal or guilt, and that defendant was "voluntarily waiving [his] right to a Jury Trial." During this questioning, defendant also affirmed that he discussed the advantages of both a jury trial and a bench trial with his counsel and that he had enough time to consider the decision. Defendant then proceeded to explain that he wanted a bench trial as opposed to a jury trial because he did not think that he could handle a jury trial, and he believed that the jury would find him guilty because of the video alone. Finally, defendant responded "no" when his counsel asked if his decision was influenced by alcohol or any mind-altering substances. We also note that defendant had a criminal history consisting of several previous convictions, thus suggesting a familiarity with the justice system. See *People v Turner*, 375 Ill App 3d 1101, 1109; 875 NE2d 175 (Ill Ct App, 2007) ("[W]e find that defendant knowingly waived her right to trial by jury. The defendant's two prior criminal convictions, along with six prior traffic convictions, while not necessary to our decision, add additional support for a finding of a knowing waiver because the convictions demonstrate a familiarity with the criminal justice system and, thus, a familiarity with her right to a trial by jury and with the ramifications of waiving that right.").

To summarize, the discussion between defendant, defense counsel, and the trial court indicated that defendant was in the middle of exercising his right to a jury trial when he made an independent decision to pursue a bench trial instead. After requesting a bench trial, defendant discussed the merits of jury and bench trials off the record with his attorneys and then expressed on the record thought-out reasoning for pursuing a bench trial in lieu of a jury trial. This record demonstrates that, despite the arguable failure to strictly comply with a court rule, MCR 6.402(B), defendant understood that he had a right to a jury trial and voluntarily chose to waive that right. Therefore, defendant's waiver was constitutionally valid. See *Cook*, 285 Mich App at 422; *Mosly*, 259 Mich App at 96. The trial court did not plainly err by accepting it.[6] See *Cain*, 498 Mich at 116.[7]

---

[6] We emphasize that our review of this constitutional issue is for plain error. Plain error may occur when a trial court's error is contradictory to "clearly establish[ed]" caselaw. See *Carines*, 460 Mich at 770. Here, defendant has not provided us with any caselaw indicating, much less clearly establishing, that his waiver is invalid because he was not informed on the record that the right to a jury trial is constitutional in nature. And, as noted in footnote five, *supra*, federal caselaw indicates otherwise.

[7] Defendant briefly suggests that the trial court erred by failing to ensure that the waiver was in writing. As noted, however, the law does not impose such a writing requirement upon the trial court. *Reddick*, 187 Mich App at 548-549.

### III. *MIRANDA* WARNING

Next, defendant contends that the trial court erred when it admitted an inculpatory statement made by him before he was advised of his *Miranda* rights, specifically, his statement that shell casings in his possession were the ones "I shot her with." We disagree.

We review de novo a trial court's decision on a motion to suppress premised on an alleged constitutional violation. *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). Findings of fact made in the suppression hearing are reviewed for clear error. *Id*. "Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018) (quotation marks and citation omitted). Application of the law to the facts is reviewed de novo. *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001).

Further, the erroneous admission of a confession into evidence is subject to harmless-error analysis. *People v Whitehead*, 238 Mich App 1, 7; 604 NW2d 73 (1999). "Before a constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*. (quotation marks and citation omitted). "The court must determine, beyond a reasonable doubt, that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *Id*. at 7-8 (cleaned up).

Both the United States and Michigan Constitutions guarantee the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. To protect this right, police officers generally must precede "custodial interrogation" with an adequate *Miranda* warning. *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013). This warning is "advice to the accused that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. (quotation marks and citation omitted). "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *People v Barritt*, 325 Mich App 556, 561-562; 926 NW2d 811 (2018).

To determine whether a defendant is in custody for purposes of *Miranda*, "courts consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Cortez*, 299 Mich App at 692 (cleaned up). In this case, neither party disputes the trial court's determination that defendant was in custody when he made the inculpatory statement regarding the shell casings.

However, the parties disagree whether the police officers were interrogating defendant when he made the inculpatory statement. For purposes of *Miranda*, interrogation "refers to express questioning or its functional equivalent." *People v Anderson*, 209 Mich App 527, 532; 531 NW2d 780 (1995). In other words, "[i]nterrogation refers to express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997). "Statements made voluntarily by persons in custody do not fall within the purview of *Miranda*." *Id*.

After review of the record and the body camera video, we agree with the trial court that defendant's statement regarding the shell casings was spontaneous and not in response to questioning or actions by police officers which were reasonably likely to elicit an incriminating response. See *id*. Certainly, defendant was subject to custodial interrogation without *Miranda* warning before he made that spontaneous statement. But, before that point, the police officers had ended their interrogation of defendant and were transitioning into preparing defendant for transportation to the police cruiser. Then defendant without any type of police questioning or prompting made his remark regarding the shell casings.

Before their pat-down for transporting defendant started, the officers stopped asking defendant any questions and discussed among themselves the location of G.B.'s body. Then Deputy Erb told defendant to stand up and started performing a pat-down search. At the same time, Sergeant Frazer placed defendant in handcuffs. During the pat-down, defendant made the spontaneous, inculpatory statement regarding the shell casings. At the point of defendant's declaration, the police officers had concluded their questioning of him. Without the officers asking, defendant stated that the shell casings that he shot G.B. with were in his pocket. As such, defendant made his statement voluntarily and without prompting from the officers. See *id*. Further, when Sergeant Frazer's responded, "What?" after defendant's statement, defendant repeated the statement about the location of the shell casings. Sergeant Frazer's response of "What?" to defendant's statement likewise did not arise to the level of interrogation. See *People v O'Brien*, 113 Mich App 183, 196-197; 317 NW2d 570 (1982).[8] See also *United States v Corey*, 861 F Supp 2d 1341, 1345 (SD Fla, 2012) ("Where a statement is spontaneous and only followed with a clarifying question from an officer, it is not given shelter by *Miranda*.").

Defendant asserts that the physical search of him was an action reasonably likely to elicit an incriminating response. Beyond this assertion, defendant does not cite caselaw or expand on his argument why the search itself was an action reasonably likely to elicit an incriminating response from him. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment of an issue with little or no citation of supporting authority." *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004) (cleaned up). Cursory treatment constitutes abandonment of the issue. *Id*. Regardless, the record does not support the assertion that the pat-down search was conducted to elicit an incriminating response from defendant. This pat-down search was conducted immediately before defendant was removed from the house and placed in a police cruiser. It was performed in the course of arresting defendant and was aimed at securing defendant for transport and to ensure officer safety.

Alternatively, even if error occurred, it was harmless beyond a reasonable doubt. See *Whitehead*, 238 Mich App at 7. That is, admission of the statement was harmless given the

---

[8] In *O'Brien*, "a police officer testified that while being led out of the swamp [the] defendant inquired whether the 'other guy' had been caught. In response to this question the police inquired as to what other guy, and [the] defendant then described a person." *O'Brien*, 113 Mich App at 196. This Court ruled that the defendant's statement was admissible notwithstanding that he was in custody at the time because it was "volunteered." *Id*. at 197.

-10-

overwhelming evidence of defendant's guilt at the bench trial. The prosecution presented various witnesses who heard defendant state that he would kill G.B. in the weeks leading up to her death, as well as on the day of her death. Further, witnesses placed defendant at James's house with G.B. on the day of her murder. Specifically, witnesses testified that defendant left the house with G.B. carrying a .22 caliber rifle with him. Later, defendant returned home alone and proceeded to show several people a video that he recorded of himself stomping on G.B. and berating her for approximately 12 minutes. In addition to showing several people this video, defendant's father testified that defendant called him the night of the murder and requested assistance hiding a body and telling him that he killed someone. The day after the murder, defendant was arrested with two .22 shell casings on his person. Likewise, a .22 caliber rifle was seized from the house. The shell casings were forensically linked to the .22 caliber rifle at trial. This evidence placed defendant at the house the day of the murder. Moreover, the video that defendant bragged about to the witnesses connected defendant to the manner of death.

Beyond this evidence, defendant made additional inculpatory statements to officers after he was arrested. He told one officer that he made a video of himself stomping on G.B. Additionally, after defendant was arrested and incarcerated, he made the statement, "I will kill you bitches just like I killed the other bitch" to a corrections officer during a move from a lower security cell to a higher security cell. As a whole and in context, defendant's statement regarding the shell casings is inconsequential in comparison to the rest of the evidence presented at trial. Accordingly, any error arising from admission of the shell-casings statement was harmless beyond a reasonable doubt.

## IV. SENTENCING

Next, defendant contends that the trial court imposed a sentence unauthorized by law and violated the prohibition against cruel or unusual punishment, Const 1963, art 1, § 16, when it ordered as a condition of his sentence that he have no contact with individuals outside prison except for legal counsel. We agree that this condition of sentence is unauthorized by law.

After sentencing defendant to life in prison without parole, the trial court added a condition to his sentence. The trial court ordered that defendant was "to have no JPay, no emails, no phone calls, no letters; only to have contact with his attorney." In essence, this condition requires that defendant have no contact with individuals outside prison except for legal counsel. In support of this condition, the trial court explained that defendant "should not have any contact with anyone outside the prison until the day he dies. He's lost that privilege in my mind, and no one should have contact with him either."[9]

Because defendant failed to object to this condition when it was imposed at sentencing, we review this issue for plain error affecting substantial rights. See *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).

---

[9] We note that the trial court apparently has imposed a similar sentence condition in at least one other case, *People v Lake*, Docket Nos. 365824, 365826 & 365827.

However, the prosecution concedes on appeal that this condition is invalid because it is unauthorized by law,[10] and we agree with the prosecution.

We conclude that there is no authority for the additional sentencing condition imposed by the trial court. When a trial court imposes a no-contact order as a condition of sentence, it must be authorized to do so either by statute or inherent authority. See *United States v Santos Diaz*, 66 F4th 435, 441 (CA 3, 2023). "A judge of a court having jurisdiction may pronounce judgment against and pass sentence upon a person convicted of an offense in that court. The sentence shall not exceed the sentence prescribed by law." MCL 769.1(1). See also *In re Bonner*, 151 US 242, 257; 14 S Ct 323; 38 L Ed 149 (1894) ("It is plain that such court . . . in rendering [criminal] judgment, the court keeps within the limitations prescribed by the law, customary or statutory. When the court goes out of these limitations, its action, to the extent of such excess, is void."). Accordingly, certain conditions of sentencing, such as restitution, costs, and fines, are provided for by statute. See MCL 769.1a, 1d, & 1j. However, MCL 750.316(1) only prescribes "punishment by imprisonment for life without eligibility for parole" for first-degree murder, while MCL 750.85 prescribes "imprisonment for life or any term of years" for torture. These statutes and the other statutes under which defendant was convicted, see MCL 750.224f and MCL 750.227b, provide for terms of imprisonment without reference to authority of the trial court to prohibit contact with all, or virtually all, individuals outside prison. Moreover, there is no statute expressly authorizing the trial court to impose a blanket no-contact condition of sentence as was imposed in this case, and we are unaware of any statute that authorizes such a sentence by implication. Thus, we conclude that the condition of sentence imposed by the trial court here is unauthorized by statute.[11]

---

[10] Specifically, the prosecution suggests that a court has inherent authority to impose a limited no-contact condition when sentencing a defendant to prison if it is "reasonable." However, the prosecution concedes that the broad conditions in this case are invalid.

[11] Admittedly, a trial court possesses statutory authority to impose a limited no-contact order in certain circumstances. For example, in *People v Miller*, 182 Mich App 711, 713-714; 452 NW2d 890 (1990), we explained that a trial court may order no contact with a specified individual as a probation condition if there is "a rational relationship between the restriction and rehabilitation." The source of this authority is MCL 771.3(3), which provides that "the court may impose . . . lawful conditions of probation as the circumstances of the case require or warrant or as in its judgment are proper." We are unaware of any comparably broad statute prohibiting contact to the entire world, excluding an attorney, outside of the confines of the four walls of a prison. In addition, we recognize that MDOC has administrative rules and policies in place to address an individual's request to limit contact from a prisoner. See Mich Admin Code, R 791.6603(5)(e) ("A prisoner shall not be allowed to send or receive any item of mail that is . . . addressed to any party who expressly objects to receiving mail from a prisoner if the item is sent after the prisoner has been notified of the objection."); MDOC Policy Directive 05.03.118 (mail) ("Prisoners shall be permitted to send and receive uncensored mail to or from any person or organization unless the mail violates this policy or Administrative Rule 791.6603); MDOC Policy Directive 05.03.119 (e-mail) ("A person may block receipt of an e-mail from a prisoner if they choose to do so."); MDOC

Further, we also conclude that the trial court did not possess the inherent authority to impose this condition of sentence. "[T]rial courts have long had the inherent authority to control their courtrooms . . . ." *People v Rose*, 289 Mich App 499, 509; 808 NW2d 301 (2010). "[T]his inherent authority . . . includes the ability to employ procedures that assist a witness when testifying, such as the use of a witness screen to prevent the witness from seeing the defendant[.]" *People v Johnson*, 315 Mich App 163, 177; 889 NW2d 513 (2016). Moreover, courts possess limited inherent authority "to properly continue the administration of justice." *Employees and Judge of Second Judicial Dist Ct, Second Div v Hillsdale Co*, 423 Mich 705, 757; 378 NW2d 744 (1985) (WILLIAMS, C.J., *concurring*). However, "[t]he power to protect the administration of justice must be exercised with circumspection. It may be invoked only when the defendant's conduct presents significant interference with the administration of justice." *United States v Morris*, 259 F3d 894, 900 (CA 7, 2001) (cleaned up). Given these principles, at least two federal circuits have held that a federal district court has the inherent authority to impose a no-contact order as a condition of sentence to protect a witness or victim. See *Wheeler v United States*, 640 F2d 1116, 1123 (CA 9, 1981) (protection of witnesses); *Morris*, 259 F3d at 901 (protection of victims). Consequently, there is some support for the proposition that courts have the inherent authority to impose a limited no-contact order as a condition of sentence for protective, not punitive, purposes. Regardless, assuming that trial courts in Michigan have the inherent authority to impose such a limited no-contact order, we find no support for the proposition that they have inherent authority to broadly prohibit contact with all individuals outside of prison, with the sole exception of legal counsel, as an additional punitive measure. That prohibition is not necessary to "continue the administration of justice," see *Hillsdale Co*, 423 Mich at 757 (WILLIAMS, C.J., *concurring*), as the incarcerated offender, such as defendant, already is subject to legislatively authorized punishment. Thus, we conclude that the trial court lacked the inherent authority to impose the condition of sentence at issue.[12]

Accordingly, we remand to the trial court for entry of an order removing this condition from defendant's amended judgment of sentence.[13]

## V. STANDARD 4 BRIEF

---

Policy Directive 05.03.130 (telephone use) ("Prisoners are prohibited from calling the victim of an offense for which the prisoner is serving unless the victim authorized the call in writing *and there is no court order prohibiting the call*.") (emphasis added).

[12] We note that the Legislature has contemplated a judicial role in protecting the privacy and safety of victims and witnesses. See, e.g., MCL 780.751 *et seq*. (William Van Regenmorter Crime Victim's Rights Act); MCL 780.851 *et seq*. (Address Confidentiality Program Act).

[13] Having so concluded, we need not decide this case on constitutional grounds, including whether the condition at issue violates the Eighth Amendment, US Const, Am VIII. See *People v Bentley*, ___ Mich App ___, ___; ___ NW2d ___ (2024) (Docket No. 364303); slip op at 3 n 3 ("It is an undisputed principle of judicial review that questions of constitutionality should not be decided if the case may be disposed of on other grounds.") (cleaned up).

Finally, in his Standard 4 brief,[14] defendant contends that he was "denied independent examination due to the fact of cost," and that if he was afforded a state-appointed expert, "he would have succeeded in proving his mental incapacity." In other words, defendant argues that the trial court violated his constitutional right to present a defense by failing to appoint an expert on his behalf who would aid a legal defense of insanity. We disagree.[15]

Unpreserved issues are reviewed for plain error affecting substantial rights. *Cain*, 498 Mich at 116.

Under the federal constitution, "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake v Oklahoma*, 470 US 68, 76; 105 S Ct 1087; 84 L Ed 2d 53 (1985). Thus, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id*. at 83. "[A] defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *People v Kennedy*, 502 Mich 206, 228; 917 NW2d 355 (2018).

We conclude that defendant is not entitled to relief for several reasons. First, the register of actions does not indicate that defendant ever filed a motion for expert assistance. Without such a motion directing the trial court's attention to the matter, defendant necessarily failed to carry his initial burden of "show[ing] the trial court that there exists a reasonable probability" that an expert is constitutionally required. See *id*. Second, defendant on appeal fails to submit an offer of proof indicating that an expert would have aided an insanity defense. Therefore, "[d]efendant has failed to establish the factual predicate of his claim." *People v Abcumby-Blair*, 335 Mich App 210, 235; 966 NW2d 437 (2020).[16] Third, as the prosecutor observes, defendant fails to establish that he

---

[14] See Administrative Order No. 2004-6.

[15] Defendant also summarily states that the prosecutor suppressed "specific evidence [that] would lead to the jury to entertain doubt as to the defendant's appellate guilt." However, defendant does not identify the evidence that the prosecutor allegedly suppressed, much less explain how that evidence possibly would have led to an acquittal in light of the overwhelming evidence of guilt. As such, we consider this issue abandoned. See *Matuszak*, 263 Mich App at 59.

[16] We acknowledge that defendant has submitted medical notes indicating that he was diagnosed with post-traumatic stress disorder, among several other mental-health issues, years before the murder. However, these notes do not establish that defendant was legally insane at the time of the murder. See *People v Carpenter*, 464 Mich 223, 231; 627 NW2d 276 (2001) (discussing the insanity defense). In fact, defendant was evaluated for competency before trial and found to be competent. Moreover, the appellate prosecutor represents that "[u]pon information and belief, based on discussions with defense counsel and the [trial] prosecutor, Lafey did undergo an independent evaluation after his forensic criminal responsibility evaluation." Thus, it appears that the question of defendant's competency was fairly assessed, and he has given us no reason to require further proceedings on the matter.

was indigent for the purposes of a court-appointed expert. See *Kennedy*, 502 Mich at 225. In fact, defendant represents in his Standard 4 brief that "defendant appellant's mother . . . offered to pay for this outside medical expert." If defendant was not indigent, he would not have been entitled to a court-appointed expert and this issue would be moot. See *id*. Simply put, defendant has failed to carry his burden of establishing entitlement to relief.

For these reasons, the trial court did not plainly err by failing to appoint an expert to aid an insanity defense.

## VI. CONCLUSION

We affirm defendant's convictions, but remand to the trial court for entry of an order removing the no-contact condition from his amended judgment of sentence. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kristina Robinson Garrett
/s/ Anica Letica